AYRES, Judge.
This is an action to recover workmen’s compensation on account of the death of Howard Wallace Brian’ The beneficiaries are the surviving widow and two minor children. The defendants are Brian’s employer, Retsal Drilling Company, Inc., and its compensation insurance carrier, Employers Casualty Company. The deceased was an oil field worker. He died about 3:00 o’clock p. m. June 23, 1957, of a coronary occlusion about one hour following his performance of strenuous manual labor at one of the employer’s oil wells located near Belcher, Caddo Parish, Louisiana.
The position of plaintiffs is that the strenuous exertion and exposure to excess heat from the sun’s rays aggravated and worsened a pre-existing heart condition and brought on, produced and/or precipitated *162 the fatal attack and accelerated his death. This the defendants deny. On that issue the case was tried. From an adverse judgment plaintiffs have appealed.
The primary issue for determination is, therefore, one of causal connection between the work performed by the deceased in the course of his employment and his death. In stating the issue, defendants submit for answer the question, did the work allegedly performed by the deceased earlier on the day of his death cause, precipitate or bring about the heart attack which resulted in his death at a time when he was not engaged in the performance of his work and was not in the course or scope of hie employment.
The facts as established by the record may be briefly summarized. The deceased, who was 42 years of age, resided near Henderson, Texas. His employment was that of a pumper in the oil fields, in addition to which he was given certain other responsibilities, particularly of a supervisory nature. His work could not be said to be ordinarily strenuous.
A statement as to decedent’s previous health appears appropriate. On the afternoon of April 29, 1955, after using a power lawn mower, Brian experienced an attack of coronary artery disease, angina pectoris, immediately following which he was seen by Dr. Paul E. Suehs, a general practitioner and cardiologist of Henderson, Texas. On that occasion Brian complained of precordial pain radiating upward into his jaw and outward into his left arm. On arriving at the doctor’s office he had quieted down but was pale. The attack, as stated, followed exertion, but the Doctor was not of the opinion there was an occlusion at that time. Bed rest was prescribed, as were certain sedatives and nitroglycerin tablets for chest pains. Other episodes or attacks followed, some of which were preceded by effort. A more serious attack, however, occurred July 11, 1956, when his condition was shown to have become generally worse, leading the Doctor to suspect on that occasion an occlusion or clot had occurred. History of exertion preceding the attack was given the Doctor. Similar treatment was administered, with instructions as to rest, avoidance of strenuous labor and the summer heat. After several days Brian again resumed his work, although frequently experiencing pains in his chest, which he relieved by taking a nitroglycerin tablet prescribed by the Doctor for that purpose.
The events transpiring on the Sunday of Brian’s death may likewise be briefly stated. On that day it was his purpose and mission to inspect an oil well of his employer located near Belcher, Louisiana, particularly as to whether it was pumping oil. Accordingly, accompanied by his wife, Brian left their home in a pick-up truck owned by his employer about 9:00 or 9 :30 a. m. and drove to the oil well, arriving near noon, after having stopped for about 20 minutes for a picnic lunch, consisting principally of fried chicken, and eggs. On completion of the approximately 100 mile trip, Brian appeared in good spirits and was apparently normal. On arriving at the well, he first climbed a ladder 10 or 12 ,feet high to the top of a storage tank and ascertained that, although the machinery was in motion, the pump was not functioning.
His work, which was very strenuous in nature, consisted of an adjustment on the machinery and the spacing of the pump, at which Brian worked for about two hours. The temperature was 90 degrees or above. Much of the work was overhead with a 36-inch Stillson wrench weighing approximately 19 pounds. He was required to extend his hands and arms over his head and do this work with this heavy tool, necessitating at times the expenditure of his every effort and strength in alternately loosening and tightening the large nuts which hold the pump and entire string of rods to the end of the beam, in order that the pump might be alternately raised and lowered in an effort to dislodge any obstruction which may have accumulated in the pump. The operation required cutting *163 off the electricity. It was then necessary that he manually operate the pulleys and/or the belts in order to readjust the height of the beam for the re-attachment of the rods and pumping apparatus. This operation was repeated over and over in an effort to properly space the pump and to cause it to operate properly.
Brian’s work was witnessed by his wife. She testified that during the course of her husband’s labor he became wet with perspiration and pale and experienced shortness of breath. She noticed he grasped his chest in the area of his heart with his hand. Although his efforts were unsuccessful in getting the pump to properly function, they got in the truck to return home.
On the return trip Brian appeared unusually quiet and pale. On reaching Little Cypress Creek, about a mile distant from Jefferson, Texas, they stopped to fish as planned before leaving home. The wife proceeded a short distance ahead of her husband. After catching one or two smaller fish and then a much larger one, he called his wife to come to his location. Immediately thereafter and before she could do so, he crumpled up and fell to the ground. He struggled for breath, first turned pale and then blue, and died within approximately 15 minutes after arriving at the scene. Dr. William S. Terry, a general practitioner of Jefferson, Texas, was called. Brian was dead on his arrival. After making an examination and interrogating those witnessing the tragedy, the Doctor concluded death resulted from an acute coronary occlusion within about three minutes of the onset of the attack. The death certificate so stated. No autopsy was performed.
Six physicians gave expert medical testimony in the case. On behalf of plaintiff these included Dr. Paul E. Seuhs, a cardiologist of Henderson, Texas, the deceased’s personal physician, and Drs. Frank T. Dienst, Jr., of Shreveport and Rufus Hale Craig of Alexandria, specialists in internal medicine as well as cardiology. On behalf of defendants appeared Dr. Terry and Drs. H. D. Tucker, a cardiologist, and William Mims Allums, a specialist in internal medicine and cardiology, both of Shreveport. Only Drs. Dienst and Allums appeared personally in court; the others testified by deposition.
Dr. Seuhs first testified as to Brian’s previous medical history. His findings were the result of consultation and examination following two previous serious heart attacks and in the course of his treatment as the deceased’s personal physician. Following each of said attacks and during the course of treatment thereafter Brian was instructed against over-working or strenuous work and avoidance of exposure to excessive heat. The Doctor testified that effort and exertion had a deleterious effect upon one with coronary artery disease in that it increased the work load of the heart. That the character of work done by Brian prior to but on the day of his death was contrary to his instructions and that “it could precipitate the attack” and stated that attacks of that character more frequently follow strenuous exertion.
But, without an autopsy, Dr. Seuhs was skeptical of the proof necessary to establish the fact of the exertion bringing on the fatal attack. From the history and information furnished the Doctor, his diagnosis, as was that of Dr. Terry, was that Brian died of a coronary thrombosis or a sudden occlusion. The Doctor further expressed the opinion that deceased could have sustained damage to his heart while working, the symptoms subsiding and later reoccurring. We are informed by his testimony that this remission of pain and other symptoms may have been induced by the taking of a nitroglycerin tablet, but not necessarily so, and that the lapse of an hour following the cessation of labor to the fatal attack was not unusual or of any particular significance as concerns a causal relationship between the effort expended and the fatal heart attack.
Dr. Dienst, from the facts as presented to him in the nature of hypothetical ques *164 tions, was also of the opinion that Brian’s death was due to coronary occlusion and most certainly of some form of heart emergency. The Doctor expressed a definite opinion that Brian’s fatal attack was caused and precipitated and his death accelerated by the labor performed at the oil well. In response to the question:
“Assuming the correctness of the information that has been given you, in your opinion was the fatal attack caused, precipitated or accelerated by the exertion of the described work in connection with his adjustment of that pumping unit?”,
the Doctor answered:
“I do feel that it was”,
and continuing in elaboration thereof further stated:
“I feel it was definitely precipitated or aggravated by the work that this man did as presented here in this case to me, and I feel that exertion has a direct relationship to the development of coronary occlusion, and it is my opinion and has been for a number of years that emotion, overexertion, and stress of any nature, no matter what it be, will definitely bring on, precipitate or aggravate, as the case may he, any cardiac emergency, whether it is acute left ventricle heart failure, coronary occlusion, coronary thrombosis, or even any arrhythmia we know of.”
In describing the mechanism through which a coronary occlusion may be brought about, the Doctor gave this explanation:
“There are small vessels that supply the inner and middle and outer covering of the coronary vessels. These small vessels are known as vasa. They are small, capillary like vessels and they don’t have too much stretch to them. Under stress and under strain they can rupture, as any blood vessel might, any vein might in the body. Suppose you hit yourself with a hammer, you get a black and blue spot. That is due to a ruptured blood vessel. It is due to blood that has passed into the tissues. This very thing can occur with the small blood vessels that supply the coronary arteries, and, as I said, they have their own blood supply too, and this particular leak can develop an area which we call a hematoma. This hematoma can continue to expand over a period of time, and it may take 30 minutes and it may take two hours or longer, until it has occluded the blood vessel. The blood, having been occluded, cannot pass through that particular vessel and it becomes coagulated and a thrombus has then developed within the blood’ vessel itself. This situation, of course, would be coronary thrombosis.”
He was then asked:
“Is that what you think happened in this case?”,
and his reply was:
“That is in the development of a coronary occlusion, and that is what I think happened in this particular man.”
He explained that exertion created an increased demand on the heart for blood ranging between 3 and 20 percent during times of strenuous exertion and the pressure, as the result thereof, on the blood vessels, would cause a breakdown of the small capillaries within the walls of the arteries themselves, with the effects as heretofore stated.
In answer to the hypothetical question presenting the facts as aforesaid to Dr. Craig, he expressed an agreement with the diagnosis as made by Dr. Terry as to the cause of Brian’s death, and further that his opinion was that the fatal attack was caused and precipitated by the exertion of Brian in connection with the work done by him at the oil well.
In describing the mechanism which in his opinion caused the coronary occlusion *165 in this particular case, Dr. Craig gave this testimony:
“A. I think that the most likely mechanism would have been one of a sub-intimal hemorrhage with gradual swelling of the lining tissues of the artery to the point where it completely occluded the vessel.
“Q. Now, what about the work— was it — what effect does exertion have on the causing or precipitating of one of these sub-intimal hemorrhages ? A. Well, with exertion there is an elevation in blood pressure all of which would be transmitted into the capillary bed and could aggravate or produce such a hemorrhage.
“Q. Now, by ‘sub-intimal hemorrhage’, what exactly do you mean, Doctor ? A. I mean beneath the intima, or lining of the artery.
“Q. Now, you are speaking of the lining of the — A. Coronary artery.
“Q. Of the coronary artery or arteries? A. Yes.
“Q. In other words, an increased exertion causes an elevation generally, of the blood pressure which includes an elevation of the blood pressure within these tiny capillaries which would cause one to start bleeding slowly inside the lining of the coronary artery, is that correct? A. Yes, with one qualification — bleeding would be slow in that it is a very tiny vessel and blood could not escape from it very rapidly.
“Q. Do you have any opinion as to when this bleeding started, and I know we are dealing with likelihoods now, whether it started at the time this individual, assuming the correctness of the facts, — assuming the correctness of the facts stated, whether it started at the time this individual was working? A. It would have had to have started sometime — assuming a gradual onset— before his death for it to have caused a large enough swelling to occlude the vessel.
“Q. And it — and is it reasonable, in your opinion, to assume that it did start during the time that he was working, based upon the signs and symptoms which I have related to you? A. I think it is reasonable to assume that.”
Dr. Craig made it clear there was a causal relationship between Brian’s work and the condition producing or causing his death. He was asked:
“Q. Doctor, I assume, from what you have said, that the type of exertion which has been described to you in this hypothetical case is the type of exertion which could elevate blood pressure to a point that it could cause a bleeding within the wall of the artery which would result in an occluding of the artery? A. Yes, it could.”
And, with reference to the lapse of approximately an hour from the last performance of labor to the fatal attack, the Doctor found nothing unusual in a remission of symptoms for such a period of time. Although Dr. Craig was in agreement with Dr. Terry as to the cause of Brian’s death, he points out if it were not a coronary occlusion, it was most certainly a form of heart attack and that the exertion was the precipitating factor. In this connection he gave this testimony:
“Q. Can you say, with reasonable medical certainty, Doctor, that whatever type of heart attack this man suffered that the exertion was the precipitating cause, that is, the exertion that was outlined to you in the hypothetical question? A. Yes.
“Q. Doctor, would you please state, for the benefit of the Court, what other possible type of heart attack than coronary occlusion this man might have had? A. This may have had an arrythmia incompatible with life, such as ventricula fibrillation, cardiac standstill.
*166 “Q. Is that a second one, cardiac standstill? Yes.
“Q. Are there any others ? A. He may have had severe coronary insufficiency which, in turn, could have led to one of the above mentioned arrhyth-mias; he may have had actual cardiac rupture through a previously weakened spot in the heart muscle; or he may have had acute left ventricula failure, anyone of which could have led to sudden death. , ¡
' “Q. Doctor, when you have a man
who has coronary artery disease such as we are told and assume Mr. Brian had, and he goes for days or even weeks without any dramatic symptoms and then after two hours of the most strenous work in the hot sun, following which he has shortness of breath, turns very pale, is wringing wet with perspiration and stands holding his hand over his heart, then you feel — and that an hour later he drops dead, it is then that you feel that you have the right, as a medical expert to relate the death to the exertion? A. Yes.
“Q. And that is what you are doing in this instance? A. Yes. Adding up the known facts about the case, that this man did work and an hour later did die, my conclusion is that they were related.”
As opposed to the aforesaid opinions, defendants contend that Brian’s heart attack was but the natural, inexorable and unavoidable culmination of a diseased process occurring irrespective of the work performed by him under the direct rays of the sun on a hot day.
Dr. Terry, on behalf of the defendants, gave this testimony:
“Q. If you assume that he had done some manual labor during that day would that, and the circumstances under which he did, would that give rise to any feeling on your part that the work did prfecipitate the death? A. Well, I wouldn’t think so on the basis that the work he was doing was the kind of work he had been doing for several years, and there is no reason for me to think that the work played any part in it at all, as far as I personally know.
“Q. Does the fact that at least an hour transpired between the work and the time of death during which he felt well enough to drive his truck to the fishing place and to get out and fish and actually catch fish give any indication or raise any basis in your mind on which you can say that the work did or did not contribute? A. I don’t believe he had been aware of it because I think if he had had pain, which would be what you would expect, I don’t believe he would have wanted to go fishing.”
It is noted that Dr. Terry’s opinion was predicated, at least, in part, on the assumption that Brian was doing the kind and character of work he had been doing for several years. The record establishes that the work done was of a very strenous nature and character in contrast to the non-strenuous work usually performed by him. On the character of the work being explained to the Doctor, he gave this testimony:
“Q. * * * If one hour before he died you had seen this man working over there in Louisiana, where he had been doing strenuous work for two hours * * *
* * * * * *
“Q. * * * And that he had handled a sledge hammer; had done a lot of overhead work, over his head, with a 36 inch Stillson wrench that weighed at least 15 pounds; where he had had to swing on that wrench and really exert himself strenuously and that during that time he became absolutely wringing wet with sweat so that the only dry threads on- him on his shirt were in his cuff, and that he became short of breath, in other words he *167 breathed deeply with his mouth open trying to get breath, and that he became extremely pale and that he was very, very tired when he finished that work. Now, if you knew that, and I ask you to accept there — it is up to me to prove- — -if you knew that, then I gather that you would feel that that might have had something to do with his coronary occlusion?
“A. I would answer this by first qualifying it and expressing this opinion. This man knew that he had a coronary insufficiency and if he was doing what you said he was doing he was a damn fool.
“Q. Because it might kill him? A. I don’t know whether it would kill him or not. Other folks do it, and that isn’t specifically shown that what he does would do it, but the man was told never to do anything which would cause pain or discomfort to him, and if he persists in doing it — there is no reason why he couldn’t lay the wrench down.
“Q. But if he persisted in doing that work and did do it it is like you say, he was a damn fool? A. That’s right, yes, sir.
“Q. Because it might kill him, isn’t that correct? A. Well, it might precipitate an attack.
“Q. And what kind of an attack might it precipitate? Just the kind he had, wouldn’t itf A. Yes, sir, but he might have died right then.”
The gist of Dr. Allum’s opinion there was lack of causal connection between Brian’s exertion and the cause of his death was given in this testimony:
“Q. * * * I want to ask you Doctor, in your professional opinion, * * * did the work which I have outlined to you in this case either cause or precipitate or trigger the death of Mr. Brian?
“A. I do not believe it did. I say that on the basis of the fact that I think on your evidence for pain is rather inconclusive. I feel like that if we are to have any causal relationship between the exertion involved and the work that was done, and the death here, we would expect one, a short interval of time involved for such a sudden exodus. We would also expect, in view of the fact there were no shorter interval of time, we would expect more symptoms, particularly of pain, especially of shock, also. We would expect a less desire to be doing any sort of exertion like driving or fishing or that sort of thing. And, therefore, I feel like that the work involved did not trigger the death here. Assuming the death was a coronary occlusion, I feel like that in all probability, it was coincidental rather than having a direct relationship.
"Q. Doctor, would you have an opinion as to whether or not death occurring as it did to Mr. Homer Wallace Brian, might have as likely occurred whether he did any work at all that day? A. Yes. In my opinion, I feel like it could have occurred like that without regard to work, whether he worked not.”
A similar opinion was expressed by Dr. Tucker, who expressed the further opinion that Brian had a coronary artery disease, a progressive type, finally taking its toll of death by an occlusion or thrombosis in the great majority of cases, the occurrence of which could not be associated with effort as a causal effect. He was of the opinion, however, that in a very small percentage of cases severe effort may precipitate death by virtue of an ischemic area of muscles of the heart, which would produce an arry-thmias, either a cardiac standstill, cardiac arrest or ventricular fibrillation, from either of which death might result. Rather than a precipitating factor, his opinion was that the exertion and attack were merely coincidental. The Doctor stated, however, *168 that under conditions of coronary insufficiency, if a person drove himself beyond that point, a myocardial infarct, or sudden death, may result from ischemia, which may occur months after the exertion. Consequently, he says that a remission of symptoms for as much as an hour was not unreasonable. He agreed with the statement of Dr. Charles K. Friedberg, author of “Diseases Of The Heart”, that there are cases where there is a causal relationship between exertion and coronary infarction and stated that it was an accepted theory that physical exertion may be indirectly related to the development of a myocardial infarct if an acute coronary occlusion had already occurred, and he agreed that physical and emotional strain may be definite factors in the pathogenesis of acute coronary changes and myocardial injury in the presence of coronary atherosclerosis and that such relationship should be considered established when a severe strain is followed by acute cardiac symptoms and definitely demonstrable acute myocardial damage. On interrogation as to the instant case, the Doctor stated:
“Oh, I think that that is one of those small percentage of cases; that under the facts that you have given me that you would have to say that this man did strenuous exertion; that he had symptoms, holding his hand over his heart; maybe not taking or he could have taken a nitroglycerin tablet when his wife wasn’t looking; that he was feeling bad and continued to feel bad let us say during this automobile trip to the place he was going fishing and what not, yes, sir, and knowing that the man had coronary artery disease I think you would have to say, or could say that under those circumstances, yes, sir, that there could have been— that you can fit in a causal relationship."
The record makes it clear that Brian had a pre-existing heart condition; that the work performed on the date and immediately prior to his death required the expenditure of strenuous physical effort for about two hours, while he was exposed to the direct rays of an early afternoon sun. Neither do we find any reason, as counsel obviously did not, to question the veracity of Mrs. Brian, who was present with her husband during the whole of the day and witnessed the performance of his labor and the tragedy of his death, or the truthfulness of her testimony as to his efforts to adjust the pumping equipment and space the oil pump and get it in operation and that he perspired most freely, became pale and clutched with his hand his breast in the area of his heart, or that thereafter they drove 35 or 40 miles, consuming approximately 45 minutes time, during which he was unusually quiet and continued pale.
While the opinions of the medical experts are not in complete accord as to whether there may, or does exist, a causal relationship between strenuous effort and coronary occlusion or coronary artery disease, or specifically as to whether or not Brian’s heart condition became aggravated or worsened by his strenuous effort and that thereby the fatal attack was brought on resulting in his death. However, from a careful study of the whole of the testimony, the conclusion is inescapable that the work Brian did and the effort expended in an unsuccessful attempt to get the oil well pump operating was sufficient to aggravate his pre-existing heart condition and to bring about and precipitate the fatal attack. Some of the experts had definite opinions that the labor performed, particularly in the manner and under the conditions it was performed, precipitated the attack, causing his death. Others were of the opinion there existed ample cause for such precipitation, that is, there was sufficient basis for a causal relationship between the work done and the cause of death. Still others were of the opinion that in a vast majority of cases there was no causal connection between strenuous labor or exertion and an attack of coronary occlusion. These, however, conceded the possibility that Brian’s labor may have induced *169 the attack causing his death. The dilemma with which some of the experts expressed concern was one of proof of a causal relation between exertion and an attack of coronary occlusion or other coronary artery disease. Their thinking was obviously from a medical or clinical standpoint — of medical proof, of its exactness and positiveness. Medical proof is thus distinguishable from legal proof which requires the establishment of a fact only by a preponderance of the evidence. Of course, proof of a bare possibility of causal relationship between the effort attending the doing of the employee’s work and the coronary incident which caused his death or disability is not sufficient but proof to an absolute certainty is not required and even in heart disease cases it has been recognized that the claimant is not confronted with the impossible task of proving the essential elements beyond any doubt. It is sufficient if there is a probable or more probable hypothesis with reference to the possibility of other hypotheses. 100 C.J.S. Workmen’s Compensation § 555(12), p. 707.
In situations of this character, the most positive statements of the medical experts are but expressions of their best opinions. In accepting this character of testimony we are only giving effect to the rule as to the requirement in civil cases that the proof must be supported by a preponderance of the evidence. In so doing we are not resorting to the realm of conjecture or speculation or indulging in possibilities or probabilities. We find this discussion in Larson’s Workmen’s Compensation Law, Vol. 2, § 80.32, p. 322:
“The distinction between probability and possibility should not follow too slavishly the witnesses’ choice of words, as sometimes happens in respect to medical testimony. A doctor’s use of such words as ‘might’, ‘could’, ‘likely’, ‘possible’ and ‘may have’, coupled with other credible evidence of a non-medical character, such as a sequence of symptoms or events corroborating the opinion, is sufficient to sustain an award. * * * The weight of such testimony, however, should not be too sharply discounted because of the disposition of the highly-trained scientific mind to refrain from unqualified statements or opinions on such matters as causation.”
Our brethren of the First Circuit Court in Sharp v. Esso Standard Oil Co., 72 So. 2d 601, 609-610, commented on the subject and stated:
“A court, in applying medical evidence to facts in a case of this kind, has to apply common sense and everyday experience to correctly resolve a situation. We know medical science knows more about these things than we do, and our experience has been, from hearing testimony of this kind, that when a doctor says ‘possible’ or ‘probable’, he does not mean that it did not happen as contended, in the sense that an ordinary layman would understand his words. In giving their testimony, all medical experts try to give guarded testimony, and some courts try to draw a distinction between possibilities and probabilities. To our way of thinking and to the modern trend of the courts in considering these terms, we should look at them in a commonsense way.”
In the language of the medical profession, the qualifications necessarily inherent in the expression of the expert’s opinion do not necessarily detract significantly from the meaning of the terms employed. The general rule as to the sufficiency of the proof of causal relationship between strenuous employment and disability or death is contained in the following quotation from Malone’s Louisiana Workmen’s Compensation, § 256, p. 314-315:
“Trauma usually associated with any strenuous employment is often sufficient to bring about the disability- or death of an employee suffering from a diseased heart or high blood: pressure. Complications in proving *170 causation arise from the fact that the natural progress of pre-existing heart infirmities can produce disability at any moment regardless of any outside influence. However, it is well settled in medical science that exertion and heat characteristic of heavy physical duties can cause severe injury to a weakened heart or blood vessel. The issue of causal relation is now usually resolved into the sufficiency of alleged exertions and overheating to injure the heart or blood vessel in the specific case. Stoking a furnace, carrying ice, operating a drag line, sawing wood, carrying cross ties, cooking glue, and boiler making have all been held to have aggravated the employee’s preexisting weakened condition. On the other hand, where the evidence showed only slight or no exertion or heat, recovery has uniformly been denied.” (Emphasis supplied)
100 C.J.S. Workmen’s Compensation § 555(12), p. 706 states the rule thusly:
“ * * * where a claim for workmen’s compensation is based on an accident or injury allegedly resulting in a disease or obstruction of the heart or blood vessels, claimant must establish by the preponderance of testimony and probability that the attack was the result of accidental strain of the heart from an accident arising out of and in the course of the employment, or, as it has been stated, it must be made to appear that there is a greater probability that the heart condition was caused by the injury than from some other cause. Proof that death or a heart attack follows shortly after a tangible happening, such as an accident or strain, is persuasive evidence of the causal relationship.
* * * * * *
“In cases of this character, courts are and should be primarily influenced to a conclusion by the opinions of medical experts. So where compensation is sought by reason of a heart attack which, it is contended, was proximately contributed to by the exertion of the employment, the evidence must show such exertion as raises a natural inference through human experience of such causation, or there must be expert medical testimony that the amount of exertion actually existing would have been sufficient to precipitate the attack; and such evidence is sufficient.”
In the comparatively recent case of Sepulvado v, Mansfield Hardwood Lumber Co., La.App., 75 So.2d 529, a case similar in character to the instant case, the evidence established that the employee’s death from coronary thrombosis had been caused by physical exertion attending his cutting logs with a cross-cut saw in the hot sun. There this court quoted, approved and followed the general rule as quoted from Professor Malone’s Louisiana Workmen’s Compensation Law as to the sufficiency of the evidence in such cases justifying an award of compensation. The rule was likewise followed in the latter case of Roberson v. Michigan Mutual Liability Co., La.App., 90 So.2d 465. In these two cases, the jurisprudence was generally reviewed pertaining to the required proof as to causal relationship between exertion and strain and heart disease and/or heart failure. The inconsequential difference between the instant case and the Sepulvado case is that here the fatal seizure occurred an hour after decedent’s strenuous work, whereas in the Sepulvado case the fatal onset occurred while the employee was actually performing duties of his employment. Brian, however, did not suffer the fatal seizure on the job but an hour later. Sepulvado experienced a remission of symptoms, however, after his first attack. It was while on the job, however, Brian suffered almost every conceivable clinical manifestation of a person with heart distress. That the fatal attack occurred an hour later is unimportant and inconse *171 quential. The question is one of causal relationship between the strenuous labor and the manner and conditions under which it was performed and the fatal attack and not the interval of time or space intervening. Kraemer v. Jahncke Services, Inc., La.App., 83 So.2d 916; Sharp v. Esso Standard Oil Co., supra.
A repetition of the review of the jurisprudence contained in the Sepulvado and Roberson cases is deemed unnecessary. However, it may be pointed out that in Hemphill v. Tremont Lumber Co., 209 La. 885, 25 So.2d 625, the employee was shown to have died about 30 minutes after he carried two 95-pound rolls of roofing material up a 12 or 13 foot ladder on a warm day in April. On coming down, the employee, wet with perspiration, took a drink of ice water and sat down in the shade, holding his hand over his heart, declaring to his co-workers he had a pain in that region. The trial court rejected claimant’s demands for compensation and this court affirmed that ruling. 24 So.2d 635. On certiorari the Supreme Court stated:
“We think the Court of Appeal fell into this error by adopting the view expressed by the defendant’s lay witnesses that the work done by Hemphill just prior to his death was usual and customary and, therefore, could not be considered as strenuous, instead of being guided by the opinions and conclusions reached by the medical experts, based on unimpeachable medical science, that the man did die from angina pectoris which could have been caused only by the effect of exertion or emotion on the heart and who, from the facts of the case presented in court and given them in a hypothetical question, concluded that Hemphill’s death resulted from a strain on the heart caused by the work done by him in the heat of the day on which he died.” [209 La. 885, 25 So.2d 628.] (Emphasis supplied)
In Lampkin v. Kent Piling Co., Inc., La.App., 34 So.2d 76, 77, Frank Lampkin, the employee, 42 years, who enjoyed apparently good health, with no indication of an existing heart ailment or high blood pressure, was stricken and died of coronary sclerosis, a narrowing or closing of blood vessels supplying the heart, while employed as a fireman. On reporting for duty, Lampkin first cleaned out the fire boxes, requiring five or six minutes time, after which he walked upstairs six or seven feet to a platform where he fed shavings into the furnace by means of a shovel. He was near the open door of the furnace when stricken. In commenting upon and evaluating the testimony, the court stated:
“Dr. L. L. Ricks of Amite, the Parish Coroner, signed the death certificate and stated that the cause of Lampkin’s death was coronary sclerosis. According to Dr. Ricks, a person may have this disease unknown to him. In his opinion, any kind of exertion or overheating of a person with this disease would cause immediate death. Dr. Sam Hobson of New Orleans, a specialist in heart diseases, attended the trial, listened to all the testimony and testified on behalf of the defendant. He expressed the opinion that Lampkin died of a coronary disease, probably a thrombosis, and that overheat was not a contributing cause of Lampkin’s death ‘unless it was extremely hot in the place, say around 110° or more.’ On cross-examination he admitted that exertion or excessive heat could cause an occlusion and that ‘exertion is bad’ for anyone having heart trouble.
“Drs. W. Shewen Slaughter, James R. Godfrey and John T. Lewis, reputable physicians and surgeons, all of Baton Rouge, executed affidavits which were filed in the record as their testimony. Three almost identical hypothetical questions were propounded to these Doctors and they all stated that *172 excessive heat and exertion could and probably would contribute to the death of a person suffering from heart disease. If the afflicted person had coronary sclerosis and overexerted himself or became overheated, just prior to death, these Doctors stated unequivocally that such conditions either ■caused or contributed to his death.” ■.(Emphasis supplied.)
The conclusion is, it is now well settled in medical science, that exertion and heat characteristic of heavy physical duties can cause severe injury to a weakened heart or blood vessel and that the issue of causal relation is now usually resolved into the sufficiency of the alleged exertion and overheating to injure the heart or blood vessel in the specific case. Here no conclusion would be compatible with the testimony except that the strenuous labor and exertion of Brian on the day of his death and immediately prior thereto was sufficient to aggravate his pre-existing heart condition and to precipitate the fatal attack.
The conclusion is likewise irresistible that causal relationship has been established between the deceased’s strenuous labor and his death. That the deceased was afflicted with a pre-existing heart condition is undisputed, and, by the great preponderance of the medical testimony, it is conceded that the deceased, on the day of his death, engaged, for about two hours in midday, in the performance of unusually strenuous labor, not ordinarily or customarily done; that such exertion was sufficient and adequate to aggravate the aforesaid heart condition and to precipitate and bring on the attack or occlusion of which he died within approximately an hour after cessation of his work, such being sufficient to produce the condition causing decedent’s death and death following shortly thereafter. In view of the medical testimony, the conclusion is inescapable that the employee’s death was precipitated or brought about by his strenuous labor in the hot sun and is, therefore, com-pensable. Accordingly, plaintiffs should recover compensation as prescribed in the statute, LSA-R.S. 23:1021 et seq., and their attorney’s fees fixed accordingly.
In the event of plaintiffs’ recovery, no contest was raised as to the amount of compensation payable nor as to its apportionment among the claimants. While the marriage of the daughter terminated the compensation payable to her, where the percentage of wages otherwise due the widow and remaining child or children entitle them to the maximum compensation, they shall be paid at the maximum rate, even though one of the claimants was disqualified from receiving additional compensation. Litton v. Natchitoches Oil Mill, 201 La. 37, 9 So.2d 445; Id., La.App., 8 So. 2d 751; Gillis v. New Orleans Public Service, Inc., La.App., 14 So.2d 112; Lajaunie v. Rex Ice Cream Co., La.App., 62 So.2d 203.
For the reasons thus assigned, and finding that the claimants are entitled to compensation as claimed, the judgment appealed is annulled, avoided, reversed and set aside, and,
It is now Ordered, Adjudged and Decreed there be judgment herein in favor of the plaintiff, Mrs. Lorraine B. Brian, individually and as natural tutrix of the minor, Roxanne Dinkens, against the defendants, Retsal Drilling Co., Inc., and Employers Casualty Company, in solido, for the full sum and weekly compensation of $26.25 per week from June 23, 1957, to December 25, 1957, and for the full sum and weekly compensation at the rate of $35 per week from December 25, 1957, for the period of their dependency, not, however, exceeding 400 weeks, together with five percent per annum interest on each of said installments from its maturity until paid.
It is further Ordered, Adjudged and Decreed there be judgment herein in favor of plaintiff, Mrs. Effie Louise Brian Duke, *173 against the defendants, Retsal Drilling Co., Inc., and the Employers Casualty Company, in solido, for the full sum and weekly compensation of $8.75 per week from June 23, 1957, to December 25, 1957, with five percent per annum interest on each of said installments from its maturity until paid.
It is further Ordered, Adjudged and Decreed that the defendants pay all costs, including the expert witnesses’ fees, hereby fixed and taxed as costs in the sum of $50 each, as well as the cost of this appeal.
It is further Ordered, Adjudged and Decreed that plaintiffs’ attorney’s fees be fixed in accordance with the provisions of the statute effective as of the date of the employee’s death at 20 percent of the amount which may be collected and/or recovered herein, the fee, however, not to exceed $1,000.
Reversed and rendered.
HARDY, J., absent.