ELLIS, Judge:
Plaintiff Newton Starkey brings this suit for workman’s compensation benefits for permanent and total disability arising out of an accident which allegedly happened on July 11, 1968. Defendant is Louisiana Hatcheries, Inc., his employer. After trial on the merits, judgment was rendered awarding plaintiff compensation at the rate of $35.00 per week for 100 weeks, and for medical expenses totalling $3,169.95, and defendant has appealed. Plaintiff has answered the appeal asking for benefits at the rate of $45.00 per week for 500 weeks, and for statutory penalties and attorney’s fees.
Plaintiff was employed by defendant as a truck driver. On the afternoon of July 11, 1968, he was instructed to pick up a load of wood shavings. While engaged in loading his truck, plaintiff testified that he slipped and fell down the pile of shavings, striking his left knee and backT” ’He"festi-'' fied that the blow to his knee ruptured a boil thereon. He stopped loading his truck and returned to defendant’s place of business. He told one Willie Graves, a fellow employee, about his fall, but mentioned it to no one else.
That evening, about two hours after his fall, he discovered a red streak 18 inches long running from the site of the boil up the inside of his leg. He was driven to the Seventh Ward Hospital by his father, and there treated by Dr. James Andres. According to the hospital chart and the testimony of the nurse who took the history, plaintiff said that he had picked the boil, and the red streak resulted. Plaintiff denied he had given a history to the nurse. Plaintiff’s father testified that he gave the history to the nurse, and that he did not at that time know that plaintiff had fallen while at work.
Dr. Andres prescribed an antibiotic for plaintiff and advised him to put warm compresses on the boil. The condition cleared up routinely, and plaintiff returned to work until July 20, when his back was hurting so badly that he once again had to quit work. He was seen again by Dr. Andres, who referred him to the Lallie Kemp Hospital. He was treated there, and at the Seventh Ward Hospital until September, 1968, when he was transferred to Charity Hospital in New Orleans. While there, it was discovered that he had an epidural abscess in his low back, and, on December 5, 1968, a laminectomy was performed and the abscess surgically removed.
*167 Plaintiff went back to work in a filling station in September, 1969, and was working, according to his testimony, 15 hours per day, seven days a week. He told Dr. R. C. Grunsten, an orthopedic surgeon who evaluated him in October, 1969, that he had occasional soreness in his low back. Dr. Grunsten was of the opinion that plaintiff had suffered a loss of 15% to 20% of the function of his body as a whole as a result of the loss by surgery of the two laminae in his low back. However, plaintiff was then working full time, with no apparent impediment other than the occasional soreness.
It is plaintiff’s position that the blow to his knee caused the infection in the boil to spread through his lymphatic system, and cause the epidural abscess which in turn caused his disability.
Defendant denies that the accident ever happened, and denies that plaintiff has shown by the required preponderance of the evidence that the epidural abscess resulted from the blow to his knee.
Defendant’s claim that no accident happened is based on the failure of the plaintiff to notify his employer thereof, and on the history reflected by the Seventh Ward Hospital chart that he had picked the boil. Opposed to this is the plaintiff’s own testimony, the testimony of Willie Graves that plaintiff had told him of falling and striking his knee and back, and the testimony of plaintiff’s father that he gave the erroneous history, not knowing that his son had fallen. The record also shows that defendant was notified of the accident on July 29, 1968, by plaintiff’s mother. The district judge resolved the question in favor of plaintiff, and we find no manifest error in his finding to that effect.
On the question of the causal relation between the blow to the knee and the epidural abscess which was the immediate cause of plaintiff’s disability, plaintiff offered the depositions of Dr. Grunsten and Dr. Harry Dascomb, the internist, who treated plaintiff at Charity Hospital. Defendant offered the deposition of Dr. James Andres, who originally treated plaintiff.
Dr. Grunsten’s testimony was as follows:
“ . . . and assuming that he had an injury to his back and this organism ultimately spread to the point of the injury which had been made vulnerable by the injury there is reasonable cause or relation between the abscess and the trauma and the subsequent spread to an area of additional trauma, this is a medical possibility and I think it is the most reasonable explanation in my opinion.
“Q. You say it is a medical possibility, is it a matter of fact that such a cause or relationship is capable of definite objective proof to remove any other reasonable hypothesis?
“A. I think it is the most logical explanation for the sequence of events that has been presented thus far in this case.”
When asked if he thought there was a connection between the blow to his knee and the epidural abscess, Dr. Dascomb said:
“There is definitely a connection, I think there can be a connection between the furuncle on the skin and the subsequent development of an epidural abscess, trauma can provoke this, as it seems to have done in this case, and the presence of this red streak which, of course, reflects the extension of an organism which was present in the boil and which had gotten into the lymphatic and into the blood stream, yes, there is a connection.”
Both of these doctors admitted the possibility that the infection causing the abscess could have come from elsewhere in the body, or that it might have occurred independent of the blow to the knee.
Dr. Dascomb testified further that the fact that the red streak appeared after the blow suggested that the boil had been contained prior to that time. Both he and Dr. Grunsten also testified that a red streak 18 inches long would ordinarily take longer *168 than two hours to develop, but that it could develop in as short a period as two hours.
Dr. Andres testified that he did not connect the back difficulty with the blow to the knee, and that he was unable to account for plaintiff’s back pain, which he felt to be genuine.
Defendant contends that the foregoing testimony tends to prove only a possibility of a causal connection between the accident and the disability, and claims that this degree of proof is not sufficient to support a judgment for the plaintiff. As we view the testimony of Drs. Grunsten and Dascomb, both of whom are highly qualified in their respective fields, they have testified that, in their professional opinion, the most logical explanation of the presence of the epidural abscess is the chain of circumstances beginning with the blow to plaintiffs knee suffered in the accident. Although they admit the existence of other possibilities, they consider this one to be the most likely. We think this testimony, which is unrebutted in the record, is sufficient to prove plaintiff’s case by a preponderance of the evidence. Brian v. Employers Casualty Co., 111 So.2d 161 (La.App. 2 Cir. 1959).
Plaintiff was injured on July 11, 1968, returned to work on September 1, 1969, and was still working when the case was tried. Although he had suffered a 15% to 20% loss of the use of his body as a whole, he was not, at the time of the trial, unable to do the work of a filling station attendant, nor was he in disabling pain. There is no evidence that he could not have worked as a truck driver. He was therefore not entitled to receive compensation for temporary total disability beyond the time he returned to work, a period of 60 weeks after he was injured.
Since the trial court awarded 100 weeks, it is apparent that he considered an award under the provisions of R.S. 23:1221(4) (p) to be appropriate, in the light of plaintiff’s residual non-disabling loss of function of his back.
R.S. 23:1221(4) (p) provides as follows:
“In cases not falling within any of the provisions already made, where the employee is seriously permanently disfigured about the face or head, or where the usefulness of a physical function is seriously permanently impaired, the court may allow such compensation as is reasonable and as in proportion to the compensation hereinabove specifically provided in the cases of specific disability, not to exceed sixty-five per centum of wages during one hundred weeks.”
Under R.S. 23:1223, any award made under the above section is subject to a credit for any compensation allowed for temporary total disability. It is apparent that the district judge was of the opinion that a maximum award under R.S. 23:1221(4) (p) would be appropriate, in the light of plaintiff’s loss of function in his back. We do not believe that such a finding constitutes an abuse of the discretion accorded to the judge under that provision. See Ventress v. Danel-Ryder, Inc., 225 So.2d 765 (La.App. 3 Cir. 1969).
 Plaintiff’s request to increase the amount of the benefits to $45.00 per week is without merit. This accident occurred before the maximum weekly award was increased from $35.00 to $45.00. Neither do we think that defendant was arbitrary or capricious in refusing to pay compensation under the circumstances here presented. The refusal to pay in this case was based on both the non-occurrence of the accident, and a lack of causal connection between the accident and the disability. Under the circumstances here presented, we find that defendant’s refusal to pay compensation was made in good faith and with just cause, and that an award of penalties and attorney’s fees would not be appropriate. See Hebert v. South Louisiana Contractors, Inc., 238 So.2d 756 (La.App. 1 Cir. 1970).
The judgment appealed from is affirmed, at defendant’s cost.
Affirmed.