UNITED STATES of America,
Plaintiff,

v.

Angela JOHNSON, Defendant.

No. CR 01–3046–MWB.

United States District Court,
N.D. Iowa,
Central Division.

March 31, 2005.

Charles J. Williams, Patrick J. Reinert, US Attorney's Office, Cedar Rapids, IA, Thomas Henry Miller, Des Moines, IA, for Plaintiff.

Alfred E. Willett, Terpstra, Epping & Willett, Cedar Rapids, IA, Dean A. Stowers, Rosenberg, Stowers & Morse, Robert R. Rigg, Des Moines, IA, Patrick J. Berrigan, Watson & Dameron, LLP., Kansas City, MO, for Defendant.

**MEMORANDUM OPINION AND ORDER REGARDING SCOPE OF LIFE— AND DEATH–QUALIFYING QUESTIONS IN JURY SELECTION**

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 824
   A. *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 824
   B. *The Present Controversy* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 825

II. *LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 825
   A. *Purpose And Discretion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 825
   B. *The Starting Point: Morgan v. Illinois* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 826
      1. *The decisions below* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 826
      2. *The issues presented* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 827
         a. *Jury impartiality* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 827
         b. *The defendant's right to challenge* . . . . . . . . . . . . . . . . . . . . . . . . . . 827

       c.   *The defendant's right to inquire* .................................. 828
       d.   *Constitutionally sufficient voir dire* ............................ 829
    3.  *Holding* ......................................................... 830
  C.  **An Eighth Circuit Decision** ......................................... 831
  D.  **The McVeigh Decision** ............................................. 832
    1.  *Background* ..................................................... 832
    2.  *"General Morgan questions"* ....................................... 833
    3.  *"Specific Morgan questions"* ...................................... 834
  E.  **The Spectrum Of Case–Specific Questions** ......................... 834
    1.  *"Abstract" questions* ........................................... 835
    2.  *"Defendant's status" questions* ................................. 836
    3.  *"Case-categorization" questions* ................................ 837
    4.  *"Case-specific" questions* ...................................... 840
    5.  *"Stake-out" questions* .......................................... 842
    6.  *Summary* ........................................................ 844
  F.  **The Fallacies Of The General Rule** ............................... 844
    1.  *Misconception of Morgan* ........................................ 844
    2.  *Misconception of "stake-out" questions* ......................... 845
    3.  *Fallacious exclusion of "speculative" questions* ................ 845
    4.  *The fallacy of "extremes"* ...................................... 846
    5.  *The lesson learned from experience* ............................. 847
  G.  **A Sensible Rule** ................................................. 848

III.  **CONCLUSION** ......................................................... 849

What is the proper degree of case-specific questioning, if any, that is permissible in the course of life— or death-qualifying prospective jurors in this federal death-penalty case? That question has animated several discussions the court has had with counsel in the course of pretrial preparations in this case. Because the trial date in this case is fast approaching, the question now requires resolution.

## I. INTRODUCTION

### A. Background

Defendant Angela Johnson is facing trial beginning in April 2005 on ten capital charges arising from her alleged involvement in the murders in 1993 of five witnesses to the drug-trafficking activities of Johnson's sometime boyfriend, Dustin Honken. The alleged murder victims are Gregory Nicholson, Lori Duncan (Nicholson's friend), Amber Duncan and Kandi Duncan (Lori Duncan's daughters, ages 6 and 10, respectively), and Terry DeGeus. The capital charges are five counts of killing witnesses while engaging in a drug-trafficking conspiracy ("conspiracy murder"), in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2; and five counts of killing the same witnesses in furtherance of a continuing criminal enterprise ("CCE murder"), also in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2.

More specifically, Counts 1 through 5 of the Second Superseding Indictment in this case charge that, on or about July 25, 1993, or in the case of Terry DeGeus, on or about November 5, 1993, while engaging in an offense punishable under 21 U.S.C. § 841(b)(1)(A) and 846, relating to a conspiracy to manufacture and distribute 100 grams or more of pure methamphetamine and 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine between 1992 and 2000, Angela Johnson intentionally killed and counseled, commanded, induced, procured, and caused and aided and abetted the intentional killing of Gregory Nicholson, Lori Duncan, Amber Duncan, Kandi Duncan, and Terry DeGeus, respectively, and that such killings resulted, all in viola-

tion of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. Counts 6 through 10 of the Second Superseding Indictment charge that, on or about July 25, 1993, or in the case of Terry DeGeus, on or about November 5, 1993, while working in furtherance of a continuing criminal enterprise between 1992 and 2000 in violation of 21 U.S.C. § 848(c), Angela Johnson intentionally killed and counseled, commanded, induced, procured, and caused and aided and abetted the intentional killing of Gregory Nicholson, Lori Duncan, Amber Duncan, Kandi Duncan, and Terry DeGeus, respectively, and that such killings resulted, all in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. On November 14, 2002, the government filed a notice of intent to seek the death penalty on all ten of these charges.

Jury selection is set to begin in this case on April 12, 2005.

### B. The Present Controversy

The court and the parties have had several discussions of the manner in which jury selection will be conducted in this case. Of the many issues concerning jury selection that the court and the parties have attempted to resolve, one that stands out as requiring separate consideration in a written ruling is the extent, if any, to which the parties should be permitted to ask case-specific questions in the course of life— or death-qualifying prospective jurors. This issue arose without notice in the midst of jury selection in the separate trial of Johnson's co-defendant, Dustin Honken. At that time, the court and the parties had little opportunity to research, argue, or deliberate on the question of the scope of case-specific *voir dire* questions. Therefore, this court relied primarily on the decision of the Tenth Circuit Court of Appeals in *United States v. McVeigh*, 153 F.3d 1166, 1205–11 (10th Cir.1998), *cert. denied*, 526 U.S. 1007, 119 S.Ct. 1148, 143

L.Ed.2d 215 (1999), to impose some limitations on the scope of the parties' case-specific questions in the process of life— or death-qualifying potential jurors. In this case, where the matter can be anticipated pretrial, the court deems it appropriate to reconsider in more detail, and with more time for reflection, the following question: In an attempt to empanel a fair and impartial jury, what degree of specificity about the facts of this particular case, if any, is it permissible to include in questions to prospective jurors about their ability to consider both life and death sentences, if the defendant were to be found guilty of one or more of the capital offenses with which she is charged?

## II. LEGAL ANALYSIS

### A. Purpose And Discretion

██ Before embarking on a discussion of the proper scope of case-specific questioning in *voir dire* in a capital case, it is well to keep in mind the purpose of *voir dire*. As the Eighth Circuit Court of Appeals recently explained,

> The Sixth Amendment guarantees "the criminally accused a fair trial by a panel of impartial, indifferent jurors." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (internal quotations omitted); *see also Pruett v. Norris*, 153 F.3d 579, 584 (8th Cir. 1998). Voir dire serves the purpose of assuring a criminal defendant that this right will be protected. *See Rosales–Lopez v. United States*, 451 U.S. 182, 188, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981). "Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. Similarly, lack of adequate voir dire impairs the defendants' right to

exercise peremptory challenges ...." *Id.* (internal quotations omitted). *United States v. Ortiz,* 315 F.3d 873, 888 (8th Cir.2002). Thus, *voir dire* of prospective jurors serves a critical purpose in affording a criminal defendant a fair trial. It is also well to keep in mind that, at least in the absence of a constitutional requirement or prohibition, "[t]rial judges have broad discretion in determining how best to conduct *voir dire.*" *Id.* (noting that this discretion "is not without boundaries"). "The reason given [for such discretion] is that juror bias 'cannot be easily discerned from an appellate record.'" *Id.* (quoting *Wainwright v. Witt,* 469 U.S. 412, 429, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)). Thus, the court must determine, in the best exercise of its discretion, what degree of case-specific questioning, if any, is permissible in the course of life— or death-qualifying prospective jurors in this federal death-penalty case, guided first and foremost by the goal of *voir dire* to provide for a fair trial by a panel of impartial jurors.

In its search for direction in the exercise of its discretion on this critical issue, the court has discovered that the various paths blazed by the lower courts all have at their trail head the United States Supreme Court's decision in *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), the Court's most recent decision on life— and death-qualification of jurors in capital cases. Although this starting point is clear, the court finds that some of the paths marked out from *Morgan* might actually lead the court astray.

### B. The Starting Point: Morgan v. Illinois

In *Morgan,* the United States Supreme Court considered "whether, during *voir dire* for a capital offense, a state trial court may, consistent with the Due Process Clause of the Fourteenth Amendment, refuse inquiry into whether a potential juror would automatically impose the death penalty upon conviction of the defendant." *Morgan,* 504 U.S. at 721, 112 S.Ct. 2222. The Court concluded that a trial court may not refuse such inquiry. *Id.* at 739, 112 S.Ct. 2222. Although neither the issue as framed by the Court in *Morgan* nor the Court's analysis of that issue involved the propriety or impropriety of case-specific *voir dire,* the *Morgan* decision is nevertheless instructive on the proper role of *voir dire* in capital cases. Therefore, this court will review the background to the *Morgan* decision and the Court's analysis.

#### 1. The decisions below

In *Morgan,* in order to "death qualify" the jury, as required by *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the trial court had "questioned each venire whether any member had moral or religious principles so strong that he or she could not impose the death penalty 'regardless of the facts,'" or had asked the variant, "'Would you automatically vote against the death penalty no matter what the facts of the case were?'" *Morgan,* 504 U.S. at 722–23, 112 S.Ct. 2222. The defendant, however, requested that the court also ask prospective jurors the following "reverse-*Witherspoon*" question in order to "life qualify" the jurors: "'If you found [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?'" *Id.* at 723, 112 S.Ct. 2222 (quoting the defendant's proposed question). The trial court rejected that request and the Illinois Supreme Court affirmed. *Id.* at 723, 112 S.Ct. 2222. The Illinois Supreme Court concluded that "nothing requires a trial court to question potential jurors so as to identify and exclude any who would vote for the death penalty in every case after conviction of a capital offense." *Id.* at 724, 112 S.Ct. 2222. The United States

Supreme Court, however, reversed the judgment of the Illinois Supreme Court.

### 2. The issues presented

In *Morgan*, the Court concluded that determination of whether a trial court can refuse a request for a life-qualifying inquiry required resolution of four issues: "[1] whether a jury provided to a capital defendant at the sentencing phase must be impartial; [2] whether such defendant is entitled to challenge for cause and have removed on the ground of bias a prospective juror who will automatically vote for the death penalty irrespective of the facts or the trial court's instructions of law; [3] whether on *voir dire* the court must, on defendant's request, inquire into the prospective jurors' views on capital punishment; and [4] whether the *voir dire* in this case was constitutionally sufficient." *Id.* at 726, 112 S.Ct. 2222. The Court's resolution of these issues is instructive here.

### a. Jury impartiality

As to the first issue, the Court reiterated that "due process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Id.* at 727, 112 S.Ct. 2222; *see also Brown v. Luebbers,* 344 F.3d 770, 781 (8th Cir.2003) (citing *Morgan,* 504 U.S. at 727, 112 S.Ct. 2222, as clearly establishing federal law that " 'the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, "indifferent" jurors' "), *vacated on other grounds on rehearing en banc,* 371 F.3d 458 (2004), *cert. denied,* —— U.S. ——, 125 S.Ct. 1397, 161 L.Ed.2d 192 (2005). The Court then reiterated that it had relied on "the Sixth *and* Fourteenth Amendments to ensure the im-

partiality of any jury that will undertake capital sentencing." *Id.* at 728, 112 S.Ct. 2222 (emphasis in the original). Thus, on the first issue, the court held that a defendant is entitled to an impartial jury.

### b. The defendant's right to challenge

█ As to the second issue—whether a capital defendant is entitled to challenge for cause and have removed on the ground of bias a prospective juror who will automatically vote for the death penalty irrespective of the facts or the trial court's instructions of law—the Court held as follows:

A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence.

*Morgan,* 504 U.S. at 729, 112 S.Ct. 2222. Thus, the Court in *Morgan* held that, not only is a capital defendant entitled to an impartial jury, but such a defendant is also entitled to strike for cause any juror who will *automatically* vote for death if the defendant is convicted, without regard to the facts or the court's instructions on the law. *See United States v. Paul,* 217 F.3d 989, 1004 (8th Cir.2000) (pursuant to *Morgan,* "[a] defendant subject to the death penalty may properly challenge for cause

any juror 'who will automatically vote for the death penalty in every case' and who will not consider aggravating and mitigating circumstances as required by the instructions") (quoting *Morgan,* 504 U.S. at 729, 112 S.Ct. 2222).

### c. The defendant's right to inquire

It is the third and fourth issues considered by the Court in *Morgan,* however, that are perhaps of most interest here, because they go precisely to the constitutional minimum requirements for adequate *voir dire* to life-qualify potential jurors. As to the third issue, whether on *voir dire* the court must, on defendant's request, inquire into the prospective jurors' views on capital punishment, the Court concluded, first, that "part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." *Id.* The Court reiterated, " 'Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate *voir dire,* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.' " *Id.* at 729–30, 112 S.Ct. 2222 (quoting *Rosales–Lopez v. United States,* 451 U.S. 182, 188, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981) (plurality opinion)). "Hence," the Court explained, " '[t]he exercise of [the trial court's] discretion, and the restrictions upon inquiries at the request of counsel, [are] subject to the essential demands of fairness.' " *Id.* at 730, 112 S.Ct. 2222 (quoting *Aldridge v. United States,* 283 U.S. 308, 310, 51 S.Ct. 470, 75 L.Ed. 1054 (1931)).

Even with these principles established, the Court recognized that "[t]he adequacy of *voir dire* is not easily the subject of appellate review." *Id.* Nevertheless, the Court observed that it had "not hesitated, particularly in capital cases, to find that certain inquires must be made to effectuate constitutional protections." *Id.* For example, under appropriate circumstances, the defendant must " 'be permitted to have the jurors interrogated on the issue of racial bias.' " *Id.* at 730–31, 112 S.Ct. 2222 (quoting *Ham v. South Carolina,* 409 U.S. 524, 527, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973)). Also, and of more interest here,

> "[t]o preserve this impartiality, *Witherspoon [v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968),] constrained the State's exercise of challenges for cause:
>
> > [A] State may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death. Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected." *Id.,* at 520–523, 88 S.Ct., at 1776–1778 (footnotes omitted).

*See also Lockhart v. McCree,* 476 U.S. 162, 179–180, 106 S.Ct. 1758, 1768–1769, 90 L.Ed.2d 137 (1986).

*Id.* at 732, 112 S.Ct. 2222. Thus, *Morgan* read *Witherspoon* to bar *voir dire* designed to empanel a pro-death jury.

The Court in *Morgan* noted that, continuing where *Witherspoon* left off, it had "held affirmatively" in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), "that 'the State may exclude from capital sentencing juries that "class" of veniremen whose views would prevent or substantially impair the performance of

their duties in accordance with their instructions or their oaths.' " *Id.* at 732–33, 112 S.Ct. 2222 (quoting *Witt,* 469 U.S. at 424 n. 5, 105 S.Ct. 844). Therefore, the Court noted that it had thereafter spoken in terms of *"Witherspoon-*excludables." *Id.* at 733, 112 S.Ct. 2222 (citing *Lockhart v. McCree,* 476 U.S. 162, 180, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986)).

Next, the Court recognized its prior holding that " 'the State must be given the opportunity to identify such prospective jurors [whose opposition to the death penalty is so strong that they cannot impartially determine a capital defendant's guilt or innocence] by questioning them at *voir dire* about their views of the death penalty.' " *Id.* (quoting *Lockhart,* 476 U.S. at 170 n. 7, 106 S.Ct. 1758, and also citing *Witt,* 469 U.S. at 423, 105 S.Ct. 844, as requiring *questioning* of the potential jurors to determine lack of impartiality). Thus, although *voir dire* cannot be used to empanel a pro-death jury, the Court in *Morgan* reiterated that the State must be allowed to *voir dire* prospective jurors to determine whether or not they are "death-qualified," and the trial court may strike jurors for cause who cannot be "death-qualified." *See Paul,* 217 F.3d at 1004 (citing *Morgan* to conclude that the trial court did not abuse its discretion in striking for cause jurors who indicated that they could not fairly consider imposing the death penalty as a possible sentence, regardless of the instructions from the court).

The issue before the Court in *Morgan,* however, was the "reverse-*Witherspoon*" issue of whether or not the defendant must be afforded the opportunity to *voir dire* prospective jurors to determine whether or not they are also "life-qualified." The Court resolved that issue as follows:

> We deal here with petitioner's ability to exercise intelligently his complementary challenge for cause against those biased persons on the venire who as jurors would unwaveringly impose death after a finding of guilt. Were *voir dire* not available to lay bare the foundation of petitioner's challenge for cause against those prospective jurors who would always impose death following conviction, his right not to be tried by such jurors would be rendered as nugatory and [\*734] meaningless as the State's right, in the absence of questioning, to strike those who would never do so.

*Morgan,* 504 U.S. at 733–34, 112 S.Ct. 2222. Thus, *Morgan* requires that prospective jurors also be subjected to *voir dire* to determine whether they are "life-qualified" as well as "death-qualified."

### d. Constitutionally sufficient voir dire

The last issue before the Court in *Morgan* was "whether the questions propounded by the trial court were sufficient to satisfy petitioner's right to make [a life-qualification] inquiry." *Id.* at 734, 112 S.Ct. 2222. On that issue, the Court rejected the Illinois Supreme Court's conclusion that "general fairness" and "follow the law" questions would be sufficient to detect jurors who would automatically vote for the death penalty, because the Court was not "convinced that such general inquiries could detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath." *Id.* Indeed, the Court observed that "such jurors—whether they be unalterably in favor of, or opposed to, the death penalty in every case—by definition are ones who cannot perform their duties in accordance with law, their protestations to the contrary notwithstanding." *Id.* at 735, 112 S.Ct. 2222. The Court explained further:

As to general questions of fairness and impartiality, such jurors could in all truth and candor respond affirmatively, personally confident that such dogmatic views are fair and impartial, while leaving the specific concern unprobed. More importantly, however, the belief that death should be imposed *ipso facto* upon conviction of a capital offense reflects directly on that individual's inability to follow the law. See *supra*, at 2229. Any juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of law. See *Turner v. Murray*, 476 U.S. [28,] 34–35, 106 S.Ct. 1683, 1687–1688, 90 L.Ed.2d 27 [ (1986) ] (plurality opinion). It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so. A defendant on trial for his life must be permitted on *voir dire* [*736] to ascertain whether his prospective jurors function under such misconception.

*Morgan*, 504 U.S. at 735–36, 112 S.Ct. 2222 (footnote omitted). The Court then held that the risk that such unqualified jurors might have been empaneled in the case before it and that their views had "infected" the defendant's capital sentencing was " 'unacceptable in light of the ease with which that risk could have been minimized.' " *Id.* at 736, 112 S.Ct. 2222 (quoting *Turner v. Murray*, 476 U.S. at 36, 106 S.Ct. 1683). Instead, the petitioner "was entitled, upon his request, to inquiry discerning those jurors who, even prior to the State's case in chief, had predetermined the terminating issue of his trial, that being whether to impose the death penalty." *Id.*

In rejecting the contrary position of the dissenter, the Court insisted that jurors who would automatically vote for death upon conviction of a capital offense "obvi-ously deem mitigating evidence to be irrelevant to their decision to impose the death penalty: They not only refuse to give such evidence any weight but are also plainly saying that mitigating evidence is not worth their consideration and that they will not consider it." *Id.* at 736, 112 S.Ct. 2222. In the Court's view, the dissenter's position was contrary to the Illinois statutory scheme, which required the jury to consider any aggravating and any mitigating factors that are relevant to the imposition of the death penalty. *Id.* at 736–37, 112 S.Ct. 2222. Under such a scheme, "[a]ny juror to whom mitigating factors are ... irrelevant should be disqualified for cause, for that juror has formed an opinion concerning the merits of the case without basis in the evidence developed at trial." *Id.* at 739, 112 S.Ct. 2222.

### 3. Holding

■ To summarize, in light of its resolution of the four issues, the Court in *Morgan* held that a defendant is entitled to make an inquiry into potential jurors' ability to impose a life sentence, as well as their ability to impose a death sentence, on the basis of the facts of the case and the trial court's instructions on the law, not merely on the basis of the defendant's conviction of a capital offense. See *id.* ("Accordingly, the defendant in this case was entitled to have the inquiry made that he proposed to the trial judge," which was a "life-qualifying" or "reverse-*Witherspoon*" question, framed as follows: " 'If you found [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?' "). Because the petitioner in the case then before the Court had been afforded only inadequate *voir dire* on the life-qualification of the potential jurors, the Court held that his death sentence could not stand,

and remanded the case for further proceedings. *Id.*

More to the point for present purposes, the *Morgan* decision stands for the proposition that, in order to ensure the fairness and impartiality of the jury, a capital defendant must be afforded the opportunity to conduct adequate *voir dire* to determine whether potential jurors are capable of imposing a life sentence upon conviction in accordance with the facts and the law, just as the prosecution must be afforded the opportunity to conduct adequate *voir dire* to determine whether potential jurors are capable of imposing a death sentence upon conviction in accordance with the facts and the law. *See id.* at 729–34, 112 S.Ct. 2222. The Court determined in *Morgan* that general questions of fairness and impartiality and ability to "follow the law" are *not* sufficient to afford the defendant adequate *voir dire;* rather, the Court held that the defendant was entitled to ask, " 'If you found [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?' " *Id.* at 739, 112 S.Ct. 2222 ("[T]he defendant in this case was entitled to have the inquiry made that he proposed to the trial judge."); *see also id.* at 723, 112 S.Ct. 2222 (quoting the defendant's requested inquiry).

While the decision in *Morgan* establishes the *minimum* inquiry constitutionally required to life-qualify a jury, it does not, on its face, require, permit, or prohibit any degree of case-specificity in *voir dire* questions for the purpose of life— or death-qualifying prospective jurors, because the inquiry proposed by the defendant in that case did not involve any case-specific component. Thus, the vexing question left unanswered in *Morgan* is whether any case-specific inquiry is appropriate to determine whether a juror can truly consider both a life and a death sentence in a particular case—in other words, can a determination be made on a juror's ability to impose either sentence "no matter what the facts are," *id.* at 723, 112 S.Ct. 2222 (the question as proposed by the defendant), or "regardless of the facts and circumstances of conviction," *id.* at 735, 112 S.Ct. 2222 (the question as framed by the Court), without some inquiry into the juror's response to the facts of the particular case?

### C. An Eighth Circuit Decision

The court has found only one discussion of the scope of proper *voir dire* pursuant to *Morgan* by the Eighth Circuit Court of Appeals. In *Ramsey v. Bowersox*, 149 F.3d 749 (8th Cir.1998), the defendant proposed the following *voir dire* questions:

Could each of you consider the death penalty in this case with the understanding that under Missouri law you are never [*757] required to impose it? If Roy Ramsey is convicted of first-degree murder, are there any of you who feel he should get the death penalty regardless of any mitigation circumstances? If you are convinced beyond a reasonable doubt, that Roy Ramsey is guilty of first-degree murder, would the defense have to convince you that he should not get the death penalty? Would your views on the death penalty prevent or substantially impair your ability to follow the following instruction: You are not compelled to fix death as the punishment, even if you do not find the existence of one or more mitigating circumstances, sufficient to outweigh the aggravating circumstances or circumstances which you find to exist. You must consider all of the circumstances in deciding whether to assess and declare the punishment at death. Whether that is to be your final decision rests with you. If you find one or all of the aggravating circumstances exist be-

yond a reasonable doubt, could you still consider life without parole as a possible punishment? If you found aggravating circumstances exist beyond a reasonable doubt and that they warrant the death penalty, could you still consider life without parole as a possible punishment? If you find aggravating circumstances beyond a reasonable doubt and find that the mitigating circumstances do not outweigh the aggravating circumstances, would you still consider life without probation or parole as a possible punishment?

*Ramsey,* 149 F.3d at 756–57. However, the trial court did not ask the defendant's proposed questions:

Rather than posing these questions, the trial court told the jurors, "I'm going to ask you some questions [about] imposition of the death penalty. These questions are asked of you in the abstract, understanding that no evidence has been presented.... If you were selected as a juror in this case, you must be able to vote for both of the punishments authorized by law. My question is would you be capable of voting for a sentence of death? Would you be capable of voting for a sentence of life without parole?" (Trial Trans. at 578–80.) To help the attorneys exercise their peremptory challenges, the court also asked, "If you were chosen as a juror, would you have a tendency to favor either the death penalty, the life imprisonment penalty, or neither?" (Trial Trans. at 580.)

*Ramsey,* 149 F.3d at 757. The appellate court's concise analysis of the issue consisted of the following:

The trial court's queries were more direct and succinct than Ramsey's proposed questions, and addressed the crucial disqualification issue of whether the prospective jurors would automatically vote for or against the death penalty in

every case, *see Morgan v. Illinois,* 504 U.S. 719, 728–29, 732, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). Because the trial court's questioning reasonably assured Ramsey of a chance to detect a potential juror's prejudice about the death penalty, *see [United States v.] Spaar,* 748 F.2d [1249,] 1253 [ (8th Cir. 1984) ], Ramsey was not denied his rights to due process and a fair trial. *Ramsey,* 149 F.3d at 757.

The *Ramsey* decision suggests that abstract questions about whether the prospective jurors would vote for or against the death penalty in every case are sufficient to satisfy *Morgan's* constitutional standard. However, the *Ramsey* decision, like the *Morgan* decision, sheds little light on the propriety or impropriety of case-specific questions, because the defendant did not propose any such questions. Rather, the defendant's questions were about the burden of proof and the weighing of aggravating and mitigating factors, all in the abstract. *See id.* at 756–57. Consequently, *Ramsey* cannot be read to hold that case-specific questions are either permitted or prohibited. Therefore, this court must look further afield to determine whether case-specific questions are required, permitted, or prohibited.

### D. The McVeigh Decision

In a truly notorious federal death-penalty case, however, the Tenth Circuit Court of Appeals did confront more directly the question with which this court now grapples. That case was *United States v. McVeigh,* 153 F.3d 1166, 1205–11 (10th Cir.1998), *cert. denied,* 526 U.S. 1007, 119 S.Ct. 1148, 143 L.Ed.2d 215 (1999), which arose from the bombing of the Murrah Building in Oklahoma City, Oklahoma.

#### 1. Background

In *McVeigh,* the Tenth Circuit Court of Appeals found that "it appears that the

defense objected to the court's refusal to allow it to ask prospective jurors whether the facts of the bombing already known to them as a result of pretrial publicity predisposed them to vote in favor of the death penalty." *McVeigh,* 153 F.3d at 1205. The defendant contended that the trial court had violated *Morgan* by restricting his ability to ask two types of "*Morgan* questions": "general *Morgan* questions" which "consist[ed] of non-context-specific questions that generally [sought] to determine a juror's core value system, *i.e.,* whether the juror would automatically impose the death penalty if [the defendant] were convicted of a capital offense"; and "specific *Morgan* questions" which "consist[ed] of context specific questions that focus on whether the facts of the bombing, as revealed through pretrial publicity, had predisposed prospective jurors toward imposing the death penalty on anyone convicted of this particular crime." *Id.* at 1206. The court considered the two types of questions separately in the context of its reading of *Morgan* as requiring that, "upon a defendant's request, a trial court is obligated to ensure that prospective jurors are asked sufficient questions to allow the court and parties to determine whether, should the defendant be convicted, the jurors have already decided to apply the death penalty, or whether they would truly weigh any mitigating and aggravating factors found at the penalty phase of the trial." *Id.*

### 2. *"General Morgan questions"*

The Tenth Circuit Court of Appeals found that the defendant had been precluded from asking only one "general *Morgan* question," which was the following: "If the allegations did—if you served on the jury and heard all the evidence in the guilt/innocence part of the trial and the jury voted that Mr. McVeigh was guilty, would you feel in that instance that the

death penalty automatically should apply?" *Id.* The court held that the question was improper, first, because it was "predicated on pretrial 'allegations' made against" the defendant and "it asked the juror to speculate as to her opinion based on allegations not even in evidence." *Id.* at 1207. Second, the court ruled that the question was improper, because it was "broader than the scope of the inquiry *Morgan* requires." *Id.* Specifically,

> The question approved in *Morgan* was the following: "If you found [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?" *Morgan,* 504 U.S. at 723, 112 S.Ct. 2222, 119 L.Ed.2d 492 (emphasis added). The Supreme Court felt such a question was necessary to identify jurors who would always impose the death penalty upon conviction of a capital offense "regardless of the facts and circumstances of conviction." *Id.* at 735, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492. Here, by contrast, the question was predicated on the assumption that the juror had heard the evidence and was asked, given that evidence and a finding of guilt, how she would vote on the question of penalty. Since the juror had not yet heard the evidence, the question improperly called for speculation and sought a precommitment from the juror.

*McVeigh,* 153 F.3d at 1207. The court explained, "When a defendant seeks to ask a juror to speculate or precommit on how that juror might vote based on any particular facts, the question strays beyond the purpose and protection of *Morgan.*" *Id.* Thus, the decision in *McVeigh* seems to turn the minimum inquiry that *Morgan* requires into the maximum inquiry that *Morgan* permits, while suggesting that any attempt to probe a juror's inclination to impose the death penalty on the basis of

facts of a specific case necessarily involves "speculation" and an attempt to "precommit" the juror to a particular position.

### 3. "Specific Morgan questions"

In *McVeigh*, the Tenth Circuit Court of Appeals also concluded that the trial court had properly excluded "several inquiries that we have termed 'specific *Morgan* questions'—that is, case-specific questions on whether prospective jurors had been so influenced by the facts of the bombing, as revealed by pretrial publicity, that they believed death was the only appropriate punishment for anyone convicted of the bombing." *Id.* Again, the court reasoned that "*Morgan* does not require courts to allow questions regarding the evidence expected to be presented during the guilt phase of the trial." *Id.* at 1208. The court also noted that it had previously joined other courts holding that "*Morgan* does not require a court to allow questions regarding how a juror would vote during the penalty phase if presented with specific mitigating or aggravating factors." *Id.* (citing cases). The court again reasoned that the "specific *Morgan* questions" at issue in that case "went beyond the scope of *Morgan*" and were designed to precommit jurors to a position favorable to the defendant:

> Essentially, the questions were designed to ascertain whether the jurors felt that the circumstances of the bombing were so aggravating that no mitigating factor could compensate. Thus, these were case-specific questions seeking to determine what prospective jurors thought of the death penalty in regards to this particular case, rather than the jurors' core value system regarding imposition of the death penalty. *Morgan*, however, is designed to illuminate a juror's basic beliefs "regardless of the facts and circumstances of conviction," *Morgan*, 504 U.S. at 735, 112 S.Ct. 2222, 119 L.Ed.2d 492,

not to allow defendants to pre-determine jurors' views of the appropriate punishment for the particular crime charged. *Morgan* does not require that the questions at issue be asked.

*McVeigh*, 153 F.3d at 1208. The court also concluded that the defendant had otherwise had an adequate opportunity to life-qualify the jurors, *e.g.*, through a juror questionnaire exploring jurors' attitudes toward the death penalty and the cases in which such a penalty was appropriate or inappropriate; *voir dire* questioning of each juror about his or her ability to consider punishment less than death for a criminal act in which someone was killed; explanations by the court that the law required consideration of mitigating circumstances before deciding what penalty to impose; questioning about general fairness and impartiality; and questioning using "appropriately phrased *Morgan* questions." *Id.* at 1208–09.

Thus, *McVeigh* stands for the proposition that all case-specific questions are improper, because they exceed the scope of what *Morgan* requires.

### E. The Spectrum Of Case-Specific Questions

Although the court in *McVeigh* identified only two sorts of case-specific questions implicating *Morgan*, "general *Morgan* questions" and "specific *Morgan* questions," this court's review of other decisions suggests that there are more, possibly overlapping categories to consider. Specifically, the court finds that the applicable case law, state and federal, identifies at least the following five categories of "*Morgan* questions": (1) "abstract" questions; (2) "defendant's status" questions; (3) "case-categorization" questions; (4) "case-specific" questions; and (5) "stake-out" questions. The court, therefore, turns to identification of what questions, in its view, fall into these categories and how

courts have ruled on their permissibility under *Morgan*.

### 1. "Abstract" questions

The quintessential example of an "abstract" question is, of course, the question proposed by the defendant and approved by the Court in *Morgan*: "'If you found [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?'" *Morgan*, 504 U.S. at 723, 112 S.Ct. 2222 (quoting the defendant's proposed inquiry); *see id.* at 739, 112 S.Ct. 2222 (holding that the defendant was entitled to such an inquiry). Such a question did not purport to probe jurors' attitudes toward imposition of the death penalty in any particular circumstances, but only to ask, in the abstract, whether the jurors would always impose the death penalty if the defendant was found guilty, without consideration of the specific facts of the case.

In *Ramsey*, the trial court expressly identified comparable life-qualifying and death-qualifying questions as questions "asked in the abstract." *Ramsey*, 149 F.3d at 757 (approving the trial court's use of the following questions: "[W]ould you be capable of voting for a sentence of death? Would you be capable of voting for a sentence of life without parole?"). The Eighth Circuit Court of Appeals approved such "abstract" questions, finding that they satisfied *Morgan*, because they "addressed the crucial disqualification issue of whether the prospective jurors would automatically vote for or against the death penalty in every case," and thereby "reasonably assured [the defendant] a chance to detect a potential juror's prejudice about the death penalty." *Id.* Thus, the court concluded that such "abstract" questions adequately protected the defendant's right to due process and a fair trial. *Id.*

In *McVeigh*, the Tenth Circuit Court of Appeals went still further by holding that such "abstract" questions were the only ones that could properly be asked under *Morgan*, reasoning that "*Morgan* ... is designed to illuminate a juror's basic beliefs 'regardless of the facts and circumstances of conviction,'" while any questions about "what prospective jurors thought of the death penalty in regards to this particular case [would] allow defendants to pre-determine jurors' views of the appropriate punishment for the particular crime charged." *McVeigh*, 153 F.3d at 1208 (quoting *Morgan*, 504 U.S. at 735, 112 S.Ct. 2222).

Other courts have, likewise, taken the position that such "abstract" questions are not only permissible, but sufficient, to protect a capital defendant's constitutional right to a fair and impartial jury. *See, e.g., Oken v. Corcoran*, 220 F.3d 259, 266 (4th Cir.2000) (the trial court's question to prospective jurors in a capital trial was sufficient to ensure against a death-biased jury where court asked, "Do you have any strong feelings, one way or the other, with regard to the death penalty?" and did not ask whether jurors would automatically impose the death penalty in rape-murder cases, reasoning that *Morgan* "does not require crime-specific voir dire questions"); *Trevino v. Johnson*, 168 F.3d 173, 183 (5th Cir.1999) (*Morgan* is satisfied if the court asks whether jurors would vote automatically for the death penalty); *McQueen v. Scroggy*, 99 F.3d 1302, 1329–30 (6th Cir.1996) (a trial court's question to prospective jurors was sufficient to ensure against a death-biased jury when the court asked if prospective jurors could consider all possible penalties). Thus, "abstract" questions appear to be always permissible and generally viewed to be sufficient to satisfy a defendant's constitutional right to a fair and impartial jury.

### 2. "Defendant's status" questions

What this court means by "defendant's status" questions, the second category of "*Morgan* questions" this court has identified, are questions that do not raise facts about the alleged crime, but about the defendant's status separate and independent of the alleged crime. The Supreme Court reiterated in *Morgan* that at least one such "defendant's status" question is required, in appropriate cases, noting that, where the Fourteenth Amendment's prohibition on race discrimination is implicated, the defendant must " 'be permitted to have the jurors interrogated on the issue of racial bias.' " *Morgan*, 504 U.S. at 730–31, 112 S.Ct. 2222 (quoting *Ham v. South Carolina*, 409 U.S. 524, 527, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973)).

On the other hand, in *Richmond v. Polk*, 375 F.3d 309 (4th Cir.2004), the Fourth Circuit Court of Appeals rejected the defendant's contention that he was entitled under *Morgan* "to ask prospective jurors at *voir dire* whether, once informed that he had previously been convicted of first-degree murder, they would still be able to consider mitigating factors and impose a life sentence." *Richmond*, 375 F.3d at 329. The state trial court had rejected such a question as a "stake-out" question "aimed at determining a prospective juror's answers to legal questions before being informed of the legal principles applicable to their sentencing recommendation." *Id.* Instead, the trial court permitted the defendant " 'to ask broad ques-

tions about whether they can consider any and all aggravating circumstances and balance that against any and all mitigating circumstances whatever they may be,' " *i.e.,* the trial court permitted only "abstract" questions. *Id.* The North Carolina Supreme Court affirmed and, on a *habeas* petition, the Fourth Circuit Court of Appeals held that the decision of the North Carolina Supreme Court was neither "contrary to" nor "an unreasonable application" of *Morgan*. *Id.* at 330. The federal appellate court agreed with the state courts that "*Morgan* does not require that a capital defendant be allowed to determine at *voir dire* what a prospective juror's sentencing decision will be if presented with a specific state of evidence or circumstances. Rather, *Morgan* requires that a capital defendant be afforded an adequate opportunity at *voir dire* to identify prospective jurors 'who even prior to the State's case in chief, [have] predetermined . . . to impose the death penalty.' " *Id.* (quoting *Morgan*, 504 U.S. at 736, 112 S.Ct. 2222). Although the defendant had been precluded from asking what this court describes as his "status" question, the court held that he had otherwise been "allowed to question prospective jurors about their beliefs on the death penalty and ability to consider mitigating evidence irrespective of the facts and circumstances surrounding the [charged murders]," where he had been allowed to ask a series of what this court defines as "abstract" questions. *Id.* at 330–31.[1]

---

**1.** The questions that the defendant was permitted to ask in *Richmond* were the following:
    1. Have you given much thought to the idea of the death penalty before you were called [into] court this week? J.A. 104.
    2. If the circumstances that were argued in mitigation were not circumstances that would legally justify the killing, would you be able to give consideration to those mitigating circumstances? *Id.* at 107.

    3. As you sit there right now, and understanding that you don't know much about this case and you shouldn't, at this point, but given how you feel about things and what you have been questioned about and informed of, can you say that, if it comes down to a question of life or death in this case, that your mind is as open to a life sentence[?] *Id.* at 114.

Another "defendant's status" question might involve questions about the ability of the jurors to consider the defendant's youth as a mitigating factor. In *Trevino v. Johnson*, 168 F.3d 173 (5th Cir.1999), the defendant contended that the state trial court had erred "in refusing to allow [the defendant] to inquire during voir dire whether three prospective jurors were able to consider youth as a potentially mitigating factor." *Trevino*, 168 F.3d at 182. The Texas Court of Criminal Appeals had rejected this contention, on the grounds that the question the defendant posed was "an attempt to bind the jurors to consider youth as a mitigating factor without informing them of the applicable law"; that the trial court had, in fact, *allowed* the defendant to inquire whether these prospective jurors could consider youth as a mitigating factor; and that *Morgan* did not require such an inquiry into whether prospective jurors "could consider individual extenuating circumstances to be mitigating." *Id.* at 182–83. The Fifth Circuit Court of Appeals upheld that determination, *even assuming* that the defendant had not been allowed to ask whether prospective jurors could consider youth as a mitigating factor, because the Texas courts had not unreasonably applied *Morgan*, noting that "this circuit has previously stated that *Morgan* only 'involves the narrow question of whether, in a capital case, jurors must be asked whether they would automatically impose the death penalty upon conviction of the defendant.' "

*Id.* at 183 (quoting *United States v. Greer*, 968 F.2d 433, 437 n. 7 (5th Cir.1992), and also citing *McVeigh*, 153 F.3d at 1208).

The difference between the "defendant's status" question about race, which the Court in *Morgan* acknowledged would be required, in appropriate circumstances, and the "defendant's status" question about a prior conviction for first-degree murder, which the court in *Richmond* rejected, is readily discernible: A defendant's race is both self-evident (requiring no proof at trial) and protected by the Constitution, while a defendant's status as a felon requires proof (or at least admission or stipulation) in the course of trial and enjoys no such constitutional protection. *See, e.g., Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) (a defendant in a felon-in-possession case may avoid proof of his prior felony conviction by stipulation). While "youth" may have some constitutional protection, *see, e.g., Roper v. Simmons*, —— U.S. ——, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (the execution of individuals who were under 18 years of age at the time of their capital crimes is prohibited by the Eighth and Fourteenth Amendments), the effect of "youth" as a mitigating factor, *see Trevino*, 168 F.3d at 183, may also depend upon proof at trial.

### 3. "Case-categorization" questions

The third kind of question this court has identified is what this court describes as a

4. Would you, in reaching your determination about the appropriate sentence to vote for, either life or death, be able to give fair consideration to mitigating circumstances? *Id.* at 124.

5. So that, even though there may be evidence offered, or argued, as mitigation that you would still, bottom line, be considering a killing that was intentional, premeditated, and without any legal justification or excuse. With this little lead up, can you tell me how you would feel about the death penalty as a punishment for that kind of crime, taking those things into consideration? *Id.* at 161–62.

6. And would you choose the death penalty in every case of deliberate, premeditated, intentional murder for [*331] which there is no legal justification or excuse? *Id.* at 163.

*Richmond*, 375 F.3d at 330–31.

"case-categorization" question. Such a question asks a prospective juror about his or her ability to consider a life or death sentence, or both, in the particular category of capital case, such as murder-for-hire, felony-murder, or rape-murder, that the jurors would hear. Some courts consider such questions to be permissible, while other do not.

The Fifth Circuit Court of Appeals considered the permissibility of such a question in *Green v. Johnson*, 160 F.3d 1029 (5th Cir.1998), where the *defendant* objected to the *prosecution's* use of purportedly "case-specific" questions to "pre-commit" the jurors. More specifically, the defendant argued "that his counsel failed to object to the prosecution's allegedly asking hypothetical questions using facts exactly similar to his case in order to obtain commitments from prospective jurors regarding his guilt." *Green*, 160 F.3d at 1036. The court rejected this contention:

> The record shows that the prosecution never asked prospective jurors a hypothetical question based on the specific facts of the case at hand, thereby "committing" them to find Green guilty. Rather, the prosecution properly limited itself to hypothetical questions regarding the application of general legal issues that would be involved in the case. Specifically, the prosecution asked whether a juror could convict for capital murder if (i) the predicate felony was unsuccessful (e.g., murder in the course of an unsuccessful burglary) or (ii) a defendant were an aider and abettor rather than the triggerman. In both instances, the [*1037] prosecution's statement of Texas law was substantially correct, and the jurors were asked general hypothetical questions not implicating the unique facts of the case at hand. Therefore, neither the prosecution's hypothetical questions nor its explana-

tion of applicable Texas law was the basis for a valid objection.

*Green*, 160 F.3d at 1036–37 (footnotes omitted); *see also id.* at 1037 (also holding that the prosecution did not use improper hypothetical questions attempting to determine whether jurors "could (not would) find that it was a 'deliberate' act to wound a victim with the first shot and then shoot the victim additional times to prevent the victim from identifying his killer," because "it is clear from the context of each question that the thrust of the prosecution's examination was to ensure that the juror could distinguish between 'intentional' and 'deliberate' acts"). Thus, in *Green*, the Fifth Circuit Court of Appeals approved use of questions that explored the jurors' ability to convict a defendant if certain categories of conduct occurred, based on legal distinctions that had to be addressed in the case at hand.

Some time earlier, in *United States v. Flores*, 63 F.3d 1342 (5th Cir.1995), the Fifth Circuit Court of Appeals had also considered the propriety of what this court calls "case categorization" questions for purposes of probing a juror's attitude toward the death penalty, not just guilt or innocence. In *Flores*, a particular juror "originally did not indicate that he was opposed to the death penalty." *Flores*, 63 F.3d at 1356. However, "[l]ater, [the juror] apparently became aware that some of the victims in the case had been involved in drug trafficking and informed the court that he could never vote for the death penalty in any case in which the victim was involved with drugs." *Id.* Thereafter, the juror "agreed with the government's statement that 'if the person who is killed is another drug dealer or a competitor or somebody else who is in the same organization or something like that, in those situations [he] would never consider the death penalty, [and] would never impose the death penalty.'" *Id.* The juror main-

tained that he could not impose the death penalty where both the defendant and the victim were "in drugs." *Id.* The court held that the questioning and the exclusion of the juror were proper:

> While the process of qualifying jurors to sit in a capital case is of particular importance, "[h]ere, as elsewhere, the quest is for jurors who will conscientiously apply the law and find the facts." *Witt,* 469 U.S. at 423, 105 S.Ct. at 851–52. The district court is not limited to disqualifying only those jurors who would never vote for the death penalty, *id.* at 421, 105 S.Ct. at 850–51, but can excuse those who cannot set aside their own predilections in deference to the rule of law. *Lockhart v. McCree,* 476 U.S. 162, 176, 106 S.Ct. 1758, 1766–67, 90 L.Ed.2d 137 (1986).
>
> In [the juror's] case, the source of his bias was not the death penalty in the abstract, or in some irrelevant hypothetical case. [The juror] volunteered that he would not be able to overcome his bias and vote in favor of the death penalty where the victim was a co-conspirator in a drug trafficking case. The district court was not required to ignore this bias and did not abuse its discretion by excusing [the juror].

*Flores,* 63 F.3d at 1356. Thus, the court found it appropriate to probe a juror's attitude toward imposition of the death penalty in a case in a certain category, a case in which both the defendant and the victim were "in drugs," not just in the "abstract"; indeed, the court seemed to suggest that merely "abstract" or "irrelevant hypothetical" questions were not as instructive about a juror's true attitude as the juror's response to the category of case actually at issue.

Similarly, in *People v. Ervin,* 22 Cal.4th 48, 91 Cal.Rptr.2d 623, 990 P.2d 506 (2000), the California Supreme Court noted that it had "recently indicated that the court properly may exclude prospective jurors who have expressed an inability to impose the death penalty in any felony-murder case." *Ervin,* 91 Cal.Rptr.2d 623, 990 P.2d at 516 (citing *California v. Pinholster,* 1 Cal.4th 865, 4 Cal.Rptr.2d 765, 824 P.2d 571 (1992)). The court then considered the applicability of its prior decision to *voir dire* questions in a murder-for-hire case:

> As we stated in *Pinholster,* "Each juror's reluctance to impose the death penalty was based not on an evaluation of the particular facts of the case, but on an abstract inability to impose the death penalty in a felony-murder case." (*Id.* at p. 916, 4 Cal.Rptr.2d 765, 824 P.2d 571; *see also People v. Barnett* (1998) 17 Cal.4th 1044, 1114, 74 Cal.Rptr.2d 121, 954 P.2d 384 [exclusion proper for prospective jurors unable to consider all sentencing alternatives, including death].) *Pinholster* reached its conclusion even though the trial court had permitted the prosecutor to question the prospective jurors regarding their attitudes toward the specific facts of the case. (*People v. Pinholster, supra,* 1 Cal.4th at p. 918, 4 Cal.Rptr.2d 765, 824 P.2d 571.) *Pinholster* controls here. The record in this case discloses that each of the prospective jurors in question expressed a similar abstract inability to impose death on the hirer in a murder-for-hire case. Paraphrasing *Pinholster, supra,* 1 Cal.4th at page 917, 4 Cal.Rptr.2d 765, 824 P.2d 571, the people of the State of California have determined that murder for hire is a category of crime for which a defendant may be subject to death, depending on the circumstances. We should defer to the trial court's finding, based on their voir dire responses, that the prospective jurors at issue here were unable to follow the law in this respect. (*See People v. Fudge, supra,* 7 Cal.4th at p. 1094, 31

Cal.Rptr.2d 321, 875 P.2d 36.) Accordingly, the exclusions were proper under *Wainwright* and *Pinholster*. We note that none of the foregoing authorities suggests that, for voir dire purposes, the prosecutor must disclose all facts, aggravating or otherwise, that comprise the People's case.

*Ervin*, 91 Cal.Rptr.2d 623, 990 P.2d at 516. Thus, the California Supreme Court holds that what this court calls "case categorization" questions are appropriate to determine whether or not jurors can follow the law applicable to the category of capital case they will hear.

In contrast, in *Oken v. Corcoran*, 220 F.3d 259 (4th Cir.2000), the Fourth Circuit Court of Appeals rejected the notion that courts are required to ask prospective jurors whether they would automatically impose the death penalty in rape-murder cases, because *Morgan* "does not require crime-specific voir dire questions." *Oken*, 220 F.3d at 266 n. 4 (noting that the defendant had conceded as much). Instead, the court found that questions that "explicitly referred to the death penalty and asked whether the potential juror's feelings about the death penalty were 'strong,' "—*i.e.*, what this court calls "abstract" questions—were sufficient under *Morgan*. *Id.* at 266.

Thus, there is a split in authority on the propriety, or at least the necessity, of such "case-categorization" questions to determine whether jurors can be fair and impartial.

### 4. *"Case-specific" questions*

This court defines a "case-specific" questions as questions that ask whether or not jurors can consider or would vote to impose a life sentence or a death sentence in a case involving stated facts, either mitigating or aggravating, that are or might be actually at issue in the case that the jurors would hear. Thus, the category of "case-specific" questions, so defined, is a "general" category that may encompass "defendant's status" and "case-categorization" questions, as well as questions that address facts specific to, and subject to proof in, a particular case. "Case-specific" questions may also be "stake-out" questions, a matter to which the court will return below.

This court acknowledges that the clear majority of courts reject "*Morgan* questions" with any degree of case specificity. *See, e.g., McVeigh*, 153 F.3d at 1205–08 (also citing cases); *see also Richmond*, 375 F.3d at 329–31 (the defendant was not entitled to ask whether the jurors could still consider mitigating circumstances if they learned that he had previously been convicted of first-degree murder); *Oken*, 220 F.3d at 266 n. 4 (the court was not required to ask prospective jurors about whether they would automatically impose the death penalty in a rape-murder case); *Trevino*, 168 F.3d at 183 (*Morgan* does not require specific questions regarding specific mitigating or aggravating factors); *United States v. Tipton*, 90 F.3d 861, 879 (4th Cir.1996) (it was not an abuse of the trial court's discretion to refuse to allow detailed questioning during *voir dire* concerning specific mitigating factors), *cert. denied*, 520 U.S. 1253, 117 S.Ct. 2414, 138 L.Ed.2d 179 (1997), *and cert. denied*, 520 U.S. 1253, 117 S.Ct. 2414, 138 L.Ed.2d 179 (1997), *and cert. denied*, 520 U.S. 1253, 117 S.Ct. 2414, 138 L.Ed.2d 179 (1997); *United States v. McCullah*, 76 F.3d 1087, 1113 (10th Cir.1996) (finding that *Morgan* only requires questioning during *voir dire* regarding whether jurors would automatically impose the death penalty, and it does not require specific questioning regarding mitigating factors), *cert. denied*, 520 U.S. 1213, 117 S.Ct. 1699, 137 L.Ed.2d 825 (1997); *Louisiana v. Ball*, 824 So.2d 1089,

1110 (La.2002) ("[V]oir dire does not encompass unlimited inquiry by defendant into all possible prejudices of prospective jurors, including their opinions on evidence, or its weight, hypothetical questions, or questions of law that call for any prejudgment of supposed facts in the case. Louisiana law clearly establishes that a party interviewing a prospective juror may not ask a question or pose a hypothetical which would demand a commitment or pre-judgment from the juror or which would pry into the juror's opinions about issues to be resolved in the case. 'It is not proper for counsel to interrogate prospective jurors concerning their reaction to evidence which might be received at trial.'") (quoting *State v. Williams*, 230 La. 1059, 89 So.2d 898, 905 (1956)); *Schmitt v. Commonwealth*, 262 Va. 127, 547 S.E.2d 186, 196 (2001) (the trial court did not err by preventing the defendant "from asking prospective jurors to speculate as to whether they would automatically impose the death sentence for certain types of killings or under certain hypothetical circumstances"); *Lucas v. State*, 274 Ga. 640, 555 S.E.2d 440 (2001) (ruling that it is "improper to require the juror to enumerate hypothetical circumstances in which she might or might not vote to impose the death penalty"; rather, the proper inquiry "is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath") (internal quotation marks omitted); *Hagood v. Alabama*, 777 So.2d 162, 177–178 (Ala. Crim.App.1998) ("[T]he use of hypothetical questions is of doubtful propriety certainly where one aspect of the putative evidence is singled out to probe for a sympathetic commitment as much as to explore for an impartial mind. [Q]uestions that border on argument should be avoided while prospective jurors are being interrogated by the parties during the process of the selection of a jury. On voir dire, [a] party may not ... solicit a promise to return a particular verdict.") (internal quotation marks and citations omitted); *see also State v. Moeller*, 616 N.W.2d 424, 442 (S.D.2000) ("Although it is acceptable to use hypothetical fact situations to explain a legal concept or its application, it is improper to then ask potential jurors how they would respond to the hypothetical situation once given. Herein lies the difference between what Moeller's counsel did and what State did. It was proper for State to use the hypothetical concept of a mental defect or a 15–year–old person to explain the concept of a mitigating factor. However, it would have been improper for it to then ask the potential juror whether he would impose a life sentence or death based upon that hypothetical, especially if those were truly the facts of the case. Such a question would be akin to 'staking out' the potential juror's responses, and that is not permitted.").

Such questions are often rejected on the ground that *Morgan* does not require them. *See, e.g., McVeigh*, 153 F.3d at 1207 (rejecting "general *Morgan* questions" on the ground that a question "asking the juror how she would vote on the evidence presented at trial" is "broader than the scope of inquiry *Morgan* requires"). Indeed, the court in *McVeigh* appeared to hold that *Morgan* actually bars such case-specific questions, *see, e.g., McVeigh*, 153 F.3d at 1208, even though no such questions were proposed or considered in *Morgan*. The court in *McVeigh* also rejected such questions on the ground that they improperly call for "speculation," when no evidence has actually been presented, and the facts included may or may not be proved at trial. *See McVeigh*, 153 F.3d at 1207.

The court in *McVeigh*, like other courts, also rejected "case-specific" questions on

the ground that they are necessarily "stake-out" or "pre-commitment" questions. *See McVeigh,* 153 F.3d at 1207. However, this court sees a distinction between "case-specific" and "stake-out" questions, which it will explore by considering "stake-out" questions separately.

### 5. *"Stake-out" questions*

The decisions in *Richmond* and *McVeigh* both rejected certain case-specific questions as "stake-out" or "pre-commitment" questions. In *McVeigh,* the Tenth Circuit Court of Appeals concluded that, "When a defendant seeks to ask a juror to speculate or precommit to how that juror might vote based on any particular facts, the question strays beyond the purpose and protection of *Morgan." McVeigh,* 153 F.3d at 1207. Similarly, in *Richmond,* on *habeas* review, the Fourth Circuit Court of Appeals upheld decisions of the North Carolina state courts rejecting a case-specific question as a "stakeout" question, which the North Carolina Supreme Court had defined as a question that "sought to 'discover in advance what a prospective juror's decision will be under a certain state of the evidence ... [and] how a certain set of facts would affect his or her decision.' " *Richmond,* 375 F.3d at 329 (quoting *State v. Richmond,* 347 N.C. 412, 495 S.E.2d 677, 683 (1998)). " 'Stakeout' questions, the [state] court reasoned, are not required by *Morgan* because they seek to cause prospective jurors to pledge themselves to a future course of action and 'indoctrinate [them] regarding potential issues before the evidence has been presented and [they] have been instructed on the law.' " *Id.* at 330 (quoting *Richmond,* 495 S.E.2d at 683).

With all due respect to the courts in *McVeigh* and *Richmond,* this court does not find that the questions actually at issue in either of those cases fit the definitions of "stake-out" questions purportedly applied by those courts. First, in *McVeigh,* the Tenth Circuit Court of Appeals held that the question, "If allegations did—if you served on the jury and heard all the evidence in the guilt/innocence part of the trial and the jury voted that [the defendant] was guilty, would you feel in that instance that the death penalty automatically should apply?," was an impermissible "stakeout" question, because it was "susceptible of an interpretation asking the juror how she would vote on the evidence presented at trial." *McVeigh,* 153 F.3d at 1207. The problem with this conclusion is that the question does not ask the juror which way he or she would vote; it asks only if the juror would "automatically" find that the death penalty should apply if the defendant was convicted. Indeed, the question does not even ask about any case-specific facts. Moreover, in *Morgan,* the Supreme Court had acknowledged that the following was a proper *"Witherspoon* question" to death-qualify jurors: " 'Would you automatically vote against the death penalty no matter what the facts of the case were?' " *Morgan,* 504 U.S. at 722–23, 112 S.Ct. 2222. This court does not see a meaningful distinction between the question excluded in *McVeigh,* which only referred to finding the defendant guilty on the evidence presented at trial, without identifying any such evidence, and the proper *"Witherspoon* question" identified in *Morgan.*

The finding of a "stake-out" question by the Fourth Circuit Court of Appeals and the North Carolina courts in *Richmond,* in this court's view, is equally untenable. In *Richmond,* the Fourth Circuit Court of Appeals upheld the conclusions of the North Carolina state courts that the following question was an improper "stakeout" question: "[I]f ... knowing that [the defendant] had a previous first-degree murder conviction, could [the jurors] still

consider mitigating circumstances ... in determining their ultimate recommendation as to life or death?" *Richmond,* 375 F.3d at 329. However, this question likewise does not " 'seek to cause prospective jurors to pledge themselves to a future course of action and 'indoctrinate [them] regarding potential issues before the evidence has been presented and [they] have been instructed on the law.' '" *Id.* (quoting *Richmond,* 495 S.E.2d at 683). Instead, it asks only if the jurors can still "consider" mitigating circumstances in their ultimate recommendation for either "life or death," despite the fact that the defendant had previously been convicted of first-degree murder. It is difficult for this court to see how a question that asks about a juror's ability to consider *both* life and death sentences "stakes-out" or "pre-commits" a juror to vote one way or the other, even though a negative answer would necessarily demonstrate that the juror cannot be fair and impartial or decide the penalty without regard to the circumstances of the case.

On the other hand, North Carolina state courts have recognized the difference between an improper "stakeout" question and a question " 'designed to measure a prospective juror's ability to follow the law,' " which is " 'proper within the context of jury selection *voir dire.*' " *See, e.g., North Carolina v. Henderson,* 155 N.C.App. 719, 574 S.E.2d 700, 706 (2003) (quoting *State v. Roberts,* 135 N.C.App. 690, 522 S.E.2d 130, 135 (1999)). For example, in *Henderson,* the North Carolina Court of Appeals concluded, in a case involving sexual offenses against children, that the question, "[I]s there anybody ... who thinks that in order for you to make a decision in these cases, in order to con-

vince you beyond a reasonable doubt, that there has to be some finding made by a physician that tells you that something definitely occurred?," was an "attempt[ ] to secure an impartial jury rather than commit the jurors to a future course of action." *Id.* at 704. The court noted, first, that the law did not require medical evidence to prove that some incident occurred. *Id.* The court then explained,

> The question, "To be able to find one guilty beyond a reasonable doubt, are you going to require that there be medical evidence that affirmatively says an incident occurred?" is not the same as asking "if there is medical evidence stating that some incident has occurred, will you find defendant guilty beyond a reasonable doubt?" The latter question would appear to be clearly impermissible [because it is a "stakeout" question], regardless of the fact that the law does not require medical evidence.

*Henderson,* 574 S.E.2d at 705; *see also North Carolina v. Wiley,* 355 N.C. 592, 565 S.E.2d 22, 38 (2002) (rejecting questions about whether the jurors had ever heard of a case where they thought that life without parole or the death penalty was the proper punishment, because they "were not inquiries into whether jurors would follow the law or the court's instructions, but rather were improper stake-out questions" that attempted to "pin down prospective jurors regarding the kind of fact scenarios they would deem worthy of the death penalty or worthy of life imprisonment");[2] *accord Green,* 160 F.3d at 1036–37 (holding that the prosecution did not use improper hypothetical questions attempting to determine whether jurors "could (not would) find that it was a 'deliberate' act to wound a victim with the first

---

**2.** This tiny sampling of North Carolina cases attempting to distinguish between proper "case-specific" questions on ability to follow

the law and "stake-out" questions barely scratches the surface of a substantial body of law from that state.

shot and then shoot the victim additional times to prevent the victim from identifying his killer," because "it is clear from the context of each question that the thrust of the prosecution's examination was to ensure that the juror could distinguish between 'intentional' and 'deliberate' acts"). Thus, some courts are able to distinguish between "case-specific" questions and questions designed to determine whether jurors can "follow the law" based on fact-specific hypothetical questions.

### 6. Summary

From this survey, it appears that courts generally agree that first-category ("abstract") questions are permissible, but that fifth-category ("stake-out") questions are not. However, what is also apparent is that courts do not always agree on the permissibility of questions in the second ("defendant's status"), third ("case-categorization"), or fourth ("case-specific") categories, or even which questions fall into which categories.

## F. The Fallacies Of The General Rule

From its review of the case law and its own experience picking a jury in the death-penalty trial of Johnson's co-defendant Dustin Honken, this court finds that there are a number of persistent fallacies in the general rule. The court believes that it is instructive to explore those fallacies here.

### 1. Misconception of Morgan

This court recognizes that *Morgan* determined that a constitutionally sufficient question to determine juror bias was the following: "If you find [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?" *Morgan*, 504 U.S. at 723, 112 S.Ct. 2222. As this court noted above, this question is a "quintessential" example of an "abstract" question, because it does not

purport to probe jurors' attitudes toward imposition of the death penalty in any particular circumstances, but only asks, in the abstract, whether the jurors would always impose the death penalty if the defendant was found guilty, without consideration of the specific facts of the case or the applicable law. Nevertheless, this court finds a glaring fallacy in most of the decisions excluding any and all "case-specific" questions, of whatever type identified above, purportedly on the authority of *Morgan:* These questions simply are not precluded by *Morgan*, because *Morgan* never addressed the propriety of any "case-specific" questions.

Instead of focusing on the "case-specific" content of questions to prospective jurors, the Court in *Morgan* focused on what was necessary to empanel a fair and impartial jury. *See id.* at 727–28, 112 S.Ct. 2222. Still more specifically, the Court held that, to ensure impartiality, a defendant is entitled to strike for cause any juror who will *automatically* vote for death if the defendant is convicted, without regard to the facts or the court's instructions on the law. *Id.* at 729, 112 S.Ct. 2222. To serve that purpose, the Court held, further, that the defendant must be afforded adequate opportunity to *voir dire* prospective jurors to determine their ability to consider not just a death sentence, but a life sentence, based on the facts and the law in a particular case, rather than "automatically" imposing a particular sentence upon the defendant's conviction of a capital offense no matter what the facts were. *Id.* at 729–34, 112 S.Ct. 2222 (recognizing that life-qualifying questions are required, just as death-qualifying questions are required by *Witherspoon* ).

Thus, because this court finds that *Morgan* does not preclude, or even address, "case-specific" questions, this court believes that the issue is whether "case-

specific" questions, of any of the types identified above, are *appropriate* under *Morgan*—even though they are not constitutionally *required* by *Morgan*—to provide the parties with an adequate opportunity to *voir dire* prospective jurors for the purpose of empaneling a fair and impartial jury.

### 2. Misconception of "stake-out" questions

As the court explained above, one common justification for exclusion of "case-specific" questions is that they are necessarily "stake-out" questions. *See, e.g., McVeigh*, 153 F.3d at 1207. However, as this court suggested, it is a misconception to assume that *any* "case-specific" question is necessarily a "stake-out" question. Rather, the proper tests for whether a question is a "stake-out" question are the following: (1) Does the question "ask a juror to speculate or precommit to how that juror *might vote* based on any particular facts" (*see McVeigh*, 153 F.3d at 1207) (emphasis added)? or (2) Does it "s[eek] to 'discover in advance *what a prospective juror's decision will be* under a certain state of the evidence'" *Richmond*, 375 F.3d at 329 (quoting *State v. Richmond*, 347 N.C. 412, 495 S.E.2d 677, 683 (1998)) (emphasis added)? or (3) Does it "seek to cause prospective jurors to pledge themselves to a future course of action and 'indoctrinate [them] regarding potential issues before the evidence has been presented and [they] have been instructed on the law'" *id.* at 330 (quoting *Richmond*, 495 S.E.2d at 683)? While any "case-specific" question that asks *how a prospective juror would vote* on life or death, if presented with proof of certain facts, *is* a "stake-out" question, and does attempt to "pre-commit" the juror to a certain position, a properly framed case-specific question does not necessarily do any of these things. For example, a question about whether a juror

"could (not would) find" that certain facts establish a legal requirement for imposition of the death penalty, *see Green*, 160 F.3d at 1037, or that a prospective juror *could fairly consider* either a death or life sentence, notwithstanding proof of certain facts, commits a juror to no other position than fair consideration of the appropriate penalty in light of all of the facts and the court's instructions. *Cf. Morgan*, 504 U.S. at 729, 112 S.Ct. 2222 ("A juror who will automatically vote for the death penalty in every case *will fail in good faith to consider the evidence* of aggravating and mitigating circumstances as the instructions require him to do.") (emphasis added).

### 3. Fallacious exclusion of "speculative" questions

In this court's view, it is also fallacious to exclude "case-specific" questions on the ground that they are unduly "speculative" or on the ground that no evidence has yet been presented nor has the prospective juror been instructed on the law. First, the question specifically authorized in *Morgan* calls for a "speculative" response. For a juror to answer "yes" or "no" to the question, "If you found [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?", *see Morgan*, 504 U.S. at 723, 112 S.Ct. 2222, the juror must necessarily speculate that no set of facts would cause that juror to vote for a life sentence. Second, almost any question asked of a prospective juror about what he or she will do or will be unable to do necessarily calls for a "speculative" response, but *voir dire* often includes questions demanding that the juror do just that. For example, the question, "Can you give the same fair consideration to the testimony of the defendant that you would give to the testimony of a law enforcement officer?" is clearly an appropriate *voir dire* question, even though

it asks the juror to speculate about his or her ability to give fair consideration to the testimony of both kinds of witnesses, and indeed, is intended to indoctrinate prospective jurors to give all witnesses the same fair consideration. Third, any undue impact of hypothetical statements of facts not yet in evidence or legal concepts not yet addressed in instructions could be substantially or completely mitigated by reiteration to prospective jurors (and the jurors ultimately empaneled) that they must ultimately decide the case on the facts they find from the evidence presented and the court's instructions.

### 4. The fallacy of "extremes"

The California Supreme Court apparently embraced for some time the sufficiency of "abstract" questions. *See, e.g., California v. Jenkins,* 22 Cal.4th 900, 95 Cal. Rptr.2d 377, 997 P.2d 1044, 1107 (2000) (holding that "it was not error to refuse to permit counsel to ask questions based upon an account of the facts of this case, or to ask a juror to consider particular facts that would cause him or her to impose the death penalty," because " 'The *Witherspoon–Witt* [citations] voir dire seeks to determine only the views of the prospective jurors about capital punishment in the abstract.... [Citations.] The inquiry is directed to whether, without knowing the specifics of the case, the juror has an "open mind" on the penalty determination.' ") (quoting *People v. Clark,* 50 Cal.3d 583, 597, 268 Cal.Rptr. 399, 789 P.2d 127 (1990)). However, that court has subsequently cautioned that reliance solely on questions at either "extreme," either too "abstract" or too "case-specific," is inappropriate. *See People v. Coffman,* 34 Cal.4th 1, 17 Cal.Rptr.3d 710, 96 P.3d 30, 68–69 (2004).

As that court explained in *California v. Coffman,*

"Our decisions have explained that death-qualification voir dire must avoid two extremes. On the one hand, it must not be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties as jurors in the case being tried. On the other hand, it must not be so specific that it requires the prospective jurors to prejudge the penalty issue based on a summary of the mitigating and aggravating evidence likely to be presented. (*See People v. Jenkins [,supra,* 22 Cal.4th at pp.] 990–991 [95 Cal.Rptr.2d 377, 997 P.2d 1044] [not error to refuse to allow counsel to ask juror given 'detailed account of the facts' in the case if she 'would impose' death penalty].) In deciding where to strike the balance in a particular case, trial courts have considerable discretion."

*Coffman,* 17 Cal.Rptr.3d 710, 96 P.3d at 69 (quoting *People v. Cash,* 28 Cal.4th 703, 122 Cal.Rptr.2d 545, 50 P.3d 332 (2002)). This balance must be struck, according to the California Supreme Court, because "[p]rospective jurors may be excused for cause when their views on capital punishment would prevent or substantially impair the performance of their duties as jurors." *Id.* at 68–69 (citing, *inter alia, Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)). Still more specifically,

A challenge for cause may be based on the prospective juror's response when informed of facts or circumstances likely to be present in the case being tried. (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1005, 30 Cal.Rptr.2d 818, 874 P.2d 248.) Thus, we have affirmed the principle that either party is entitled to ask prospective jurors questions that are specific enough to determine if those jurors harbor bias, as to some fact or

circumstance shown by the trial evidence, that would cause them not to follow an instruction directing them to determine penalty after considering aggravating and mitigating evidence. *Coffman*, 17 Cal.Rptr.3d 710, 96 P.3d at 69.

In the view of the California Supreme Court, then, an "abstract" question is "extreme" precisely because it tells the court and the parties nothing about the ability of prospective jurors to " 'perform[ ] their duties as jurors *in the case being tried.*' " *Coffman*, 17 Cal.Rptr.3d 710, 96 P.3d at 69 (quoting *Cash*, 28 Cal.4th 703, 122 Cal. Rptr.2d 545, 50 P.3d 332) (emphasis added). On the other hand, it appears that what the California Supreme Court means by the "extreme" of "case-specific" questions is *not* specificity about the facts, but framing of a "case-specific" question *as a "stake-out" question.* For example, in *Coffman*, the court framed the problem as a question that is "so specific *that it requires the prospective jurors to prejudge the penalty issue* based on a summary of the mitigating and aggravating evidence likely to be presented." *Id.* (again quoting *Cash*, 28 Cal.4th 703, 122 Cal.Rptr.2d 545, 50 P.3d 332) (emphasis added). The court in *Coffman* also characterized the problem in *Jenkins* as questions that, based on a " 'detailed account of the facts,' " asked if the prospective juror " 'would impose' the death penalty." *Id.* (quoting *Jenkins*, 22 Cal.4th 900, 95 Cal.Rptr.2d 377, 997 P.2d 1044). Moreover, the court in *Coffman* expressly held that "[a] challenge for cause may be based on the prospective juror's response when informed of facts or circumstances likely to be present in the case being tried," *i.e.*, based on a "case-specific" question that is *not* framed as a "stake-out" question. *Id.* (also reaffirming "the principle that either party is entitled to ask prospective jurors questions that are specific enough to determine if those jurors harbor bias, *as to some fact or cir-cumstance shown by the trial evidence,* that would cause them not to follow an instruction directing them to determine penalty after considering aggravating and mitigating evidence") (emphasis added). Thus, the California Supreme Court recognizes that "abstract" questions may not be sufficient and that "case-specific" questions can serve the purpose of empaneling a fair and impartial jury, so long as they are not framed as "stake-out" questions, because "case-specific" questions will help identify jurors who would be prevented or substantially impaired in the performance of their duties.

## 5. The lesson learned from experience

Finally, this court's own experience with jury selection in the companion federal death-penalty case against Dustin Honken, *United States v. Honken*, No. CR 01–3047–MWB (N.D.Iowa), which involved essentially identical capital charges, suggests the insufficiency of purely "abstract" questions to determine the ability of jurors to perform their duties. In *Honken*, there were numerous examples of the phenomenon of jurors who agreed that they could "fairly consider" both life and death sentences in the abstract, but quickly acknowledged that they could only consider one penalty in a case involving certain facts. For example, in *Honken*, several potential jurors readily agreed that they could "fairly consider" both life and death sentences in the case if they found the defendant guilty. However, several of those same potential jurors stated that they were either doubtful that they could consider, or stated expressly that they could not consider, a life sentence if they found the defendant guilty of the murder of children. These responses highlight the ineffectiveness of purely "abstract" questions to probe, in these cases, whether or not a juror would be able to fulfill his or

her duty to give fair consideration to both life and death sentences no matter what the facts are. *See Morgan,* 504 U.S. at 728, 112 S.Ct. 2222 (reiterating that, in *Witt,* the Court held that " 'the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment ... is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath' ") (quoting *Witt,* 469 U.S. at 424, 105 S.Ct. 844).

### G. A Sensible Rule

■ Upon consideration of the applicable case law and the court's own experience, the court finds that, while *Morgan* does not require "case-specific" questioning of prospective jurors to satisfy constitutional requirements for life— and death-qualifying prospective jurors, "case-specific" questions are nevertheless appropriate—indeed, necessary—to empanel a fair and impartial jury in this particular case. *Morgan,* 504 U.S. at 730–34, 112 S.Ct. 2222 (*voir dire* is an important tool to determine whether jurors can be fair and impartial). Indeed, the constitutionality of "case-specific" questions was not at issue in *Morgan,* because the Court was only presented with the question of whether or not the defendant was entitled to ask an "abstract" life-qualifying question, "If you found [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?" *See Morgan,* 504 U.S. at 723, 112 S.Ct. 2222. On the other hand, this court believes that "case-specific" questions may well be *constitutionally required* in order to impanel a fair and impartial jury, because a prohibition on "case-specific" questions may unconstitutionally impede a party's "ability to exercise intelligently [a] challenge for cause against those biased persons on the venire who as jurors would unwaveringly impose" either a life or death sentence after a finding of guilt. *Morgan,* 504 U.S. at 733–34, 112 S.Ct. 2222 (noting that the defendant must be afforded the same right to strike jurors who would *always* impose death following conviction that is afforded to the prosecution to strike jurors who would *never* do so). However, this court need not reach the question of whether "case-specific" questions are *constitutionally required,* because the issue of the permissibility of "case-specific" questions has not arisen in this case in the context of either party asserting that such questions are constitutionally required or constitutionally barred. Rather, the question has only arisen in the context of what degree of case-specificity in *voir dire* questions will be permitted in this case in order for the parties to life— and death-qualify the jurors.

Like the California Supreme Court, this court finds that questions at either "extreme," either "abstract" or framed as case-specific "stake-out" questions, may fail to serve the primary goal of empaneling a fair and impartial jury. *See Coffman,* 17 Cal.Rptr.3d 710, 96 P.3d at 68–69. Rather, "either party is entitled to ask prospective jurors questions that are specific enough to determine if those jurors harbor bias, as to some fact or circumstance shown by the trial evidence, that would cause them not to follow an instruction directing them to determine penalty after considering aggravating and mitigating evidence." *Coffman,* 17 Cal.Rptr.3d 710, 96 P.3d at 69. Where "the source of [a juror's] bias [i]s not the death penalty in the abstract, or in some irrelevant hypothetical case," but the juror's inability "to overcome his bias and vote in favor of the death penalty [or a life sentence] where [some specific facts are shown]," this court is "not required to ignore this bias." *See Flores,* 63 F.3d at 1356 (juror could not

overcome his bias that he could not impose the death penalty where both the victim and the accused killer were "in drugs"). Similarly, neither this court nor the parties should be precluded from asking "case-specific" questions to attempt to discover a potential juror's bias based on facts that are or are likely to be at issue in this case.

■ The court finds, further, that no principled line can be drawn to distinguish facts that can be included in "case-specific" questions from facts that cannot, apart from the requirement that the facts included in any "case-specific" question, to have any probative value as to a juror's views, should be facts that are likely to be shown by the trial evidence or genuinely in dispute in the case. *Cf. Coffman*, 17 Cal. Rptr.3d 710, 96 P.3d at 69. Indeed, in this court's view, a sensible rule about "case-specific" questions cannot be based on the content of the questions, but must be based *on the form of such questions*. Thus, any "case-specific" question should be prefaced by "if the evidence shows," or some other reminder that an ultimate determination *must be based on the evidence at trial and the court's instructions*. Furthermore, to avoid "stake-out" questions, which this court agrees are improper, questions must be in the form of whether or not the prospective juror "could fairly consider" a life sentence, a death sentence, or both, not whether the prospective juror would vote for life or death in light of particular facts.

■ Although the court would suggest that questions concerning whether a prospective juror can fairly consider *both* potential penalties are most appropriate, the court nevertheless finds that it would be permissible for defense counsel to frame a "case-specific" question as a "life-qualifying" question (for example, either, "Could you fairly consider a life sentence if the evidence showed *x?*" or "Would you auto-matically reject a life sentence if the evidence showed *x?*"), while it would be permissible for the prosecution to frame a "case-specific" question as a "death-qualifying" question (for example, either, "Could you fairly consider a death sentence if the evidence showed *x?*" or "Would you automatically reject a death sentence if the evidence showed *x?*"). Either party may also ask "case-specific" variants of the question approved in *Morgan*, such as the following: "If you found the defendant guilty *of murdering children*, would you automatically vote to impose the death penalty, no matter what the *other* facts are?" or, "If you found the defendant guilty *of aiding and abetting the charged murders, but not actually being the 'trigger person*,' would you automatically vote to impose [either a life or death sentence], no matter what the *other* facts are?" *Cf. Green*, 160 F.3d at 1036–37 (the prosecution properly asked whether a juror could convict for capital murder if, *inter alia*, the defendant were "an aider and abettor" rather than "the trigger-man").

■ Any "case-specific" questions should also be subject to objections by opposing counsel, for example, on the grounds that they are needlessly cumulative or inflammatory or are not based upon facts that are likely to be at issue in the "merits" or "penalty" phase. The purpose of *voir dire*, again, is to empanel a fair and impartial jury, not to determine the most effective content or organization of a party's case for the "merits phase" or "penalty phase."

### III. CONCLUSION

This court acknowledges that *Morgan* does not require "case-specific" questions during *voir dire* of prospective jurors in capital cases, but neither does *Morgan* bar such questions, because the Supreme

Court never addressed in *Morgan* the issue of whether such questions are permissible. The court also does not purport to answer here the question of whether "case specific" questions are constitutionally required during *voir dire* of prospective jurors in capital cases. Nevertheless, the court holds that, in this case, "case specific" questions are appropriate—indeed, necessary—during *voir dire* of prospective jurors to allow the parties to determine the ability of jurors to be fair and impartial *in the case actually before them,* not merely in some "abstract" death penalty case. After all, if the jury selected in this case imposes the death penalty on Angela Johnson, there will be nothing "abstract" about that determination or the penalty imposed.

**IT IS SO ORDERED.**